UNITED STATES of America, Plaintiff,

v.

William A. KILPATRICK, et al., Defendants.*

No. 82–CR–222.

United States District Court,
D. Colorado.

Aug. 25, 1983.

---

* This opinion which was originally published at 570 F.Supp. 505 was withdrawn from the bound volume on order of the United States Court of Appeals for the Tenth Circuit that further publication be temporarily delayed. The order so providing has now been vacated by the Court of Appeals.

William Waller and Richard K. Rufner, Wagner and Waller, Englewood, Colo., for defendant Kilpatrick.

James L. Treece, Treece, Zbar, Webb & Kenne, Littleton, Colo., for defendant Declan O'Donnell.

James Nesland, Ireland, Stapleton & Pryor, Denver, Colo., for defendant Bank of Nova Scotia.

H. Alan Dill, Dill & Dill, P.C., Denver, Colo., for defendant Sheila Lerner.

Linda Surbaugh and Robert Miller for U.S. Atty's. Office, D. Colo., Denver, Colo., and Charles J. Alexander, Dept. of Justice, Tax Div., Washington, D.C., for U.S.

WINNER, District Judge.

This case was started with a multiple count, multiple defendant indictment returned after an investigation spanning the lives of two grand juries. Judge Kane dismissed all except one count, which left a one defendant charge of obstruction of justice case to try. It was prosecuted by three attorneys employed by the Tax Division of the Department of Justice in Washington. The single remaining count of the indictment had absolutely nothing to do with tax law, and the trial could have been handled competently and with aplomb by any assistant United States Attorney living in Denver, but the administrative decision of the Department of Justice was to send three lawyers from the Tax Division to try an obstruction of justice case, a prosecution unrelated to their professed area of expertise.

I mention this fact for one very important reason. Following a jury verdict of guilty, defendant moved for dismissal or a new trial, and the pending dismissal motions rest on accusations of IRS and prosecutorial misconduct during the grand jury proceedings and during trial. There is absolutely no suggestion of any improper conduct on the part of the United States Attorney for the District of Colorado or on the part of any of his assistants. Defense counsel carefully point out that neither they nor their client complain about anything other than acts of the IRS and Department of Justice Tax Division lawyers who ran the grand jury and tried the case. Based upon my review of the record and participation in the trial, I share their view that the Colorado United States Attorney's Office is absolutely blameless in this case so fraught with problems. Also, it should be emphasized that no one is critical of government counsel now handling the post trial motions.

To fully cover all of the headaches of this case would require a volume, and I don't plan to write that book for reasons which will appear presently. Instead, I shall highlight some of the things which occurred during the investigation and during the trial of the case. But, there are so many things to cover that this opinion won't be short. Many of the accusations are disputed by the accused government counsel and agents, but they are forced to admit a few instances of "mistake", and their denials of facts run contrary to testimony of a large number of witnesses. To accept the testimony of government witnesses at full value would require that I effectively decide that quite a few reputable lawyers and citizens of this community and other communities are guilty of perjury, and I make no such determination. The record made to date is incomplete. A full evidentiary hearing was scheduled, but, as will be explained later, present government counsel was not able to prepare for the first hearing, and the testimony of essential government witnesses was put over for three weeks. It was ordered that a summary of the testimony of government witnesses be furnished in advance of a hearing scheduled some three weeks later. The summary was furnished, but the government witnesses weren't called although I and defense counsel wanted them called.

Therefore, at this point, all I have to rely on is the summary of proposed testimony, but the witnesses have not been sworn nor have they been cross examined.

With that, then, I set the stage for some of the bizarre happenings in this case, and I do so by mentioning a frequently quoted case. In 1935, in *Berger v. United States*, 295 U.S. 78, 55 S.Ct. 629, 79 L.Ed. 1314, Justice Sutherland, speaking for a unanimous court, criticized the misconduct of the prosecutor in that case. The prosecutor had injected his personal belief concerning the facts of the case (so did a prosecutor here) and he had unfairly cross-examined witnesses. That which the court said concerning reliance by a jury on a prosecutor's integrity is even more applicable to the reliance of a grand jury on a prosecutor. As to a prosecutor's duties, the Court said:

"The United States Attorney is the representative not of an ordinary person to a controversy, but of a sovereignty whose obligation to govern impartially is as compelling as its obligation to govern at all; and whose interest, therefore, in a criminal prosecution is not that it shall win a case, but that justice shall be done. As such, he is in a peculiar and very definite sense the servant of the law, the twofold aim of which is that guilt shall not escape or innocence suffer. He may prosecute with earnestness and vigor—indeed, he should do so. But while he may strike hard blows, he is not at liberty to strike foul ones. It is as much his duty to refrain from improper methods calculated to produce a wrongful conviction as it is to use every legitimate means to bring about a just one.

*"It is fair to say that the average jury, in a greater or less degree, has confidence that these obligations, which so plainly rest upon the prosecuting attorney, will be faithfully observed..."*

Perhaps the thing which disappoints me the most is the forgetfulness of the grand jury itself in going along with having two IRS agents in charge of the IRS investigation sworn as "agents of the grand jury". Yet, I can understand, as Justice Suther-land said in *Berger v. United States*, that grand jurors rely on Justice Department lawyers for their legal advice. They should do this, but because I empanelled the first of these two grand juries, I know what those jurors were told, and I strongly suspect that the second grand jury was told about the same thing. I orally, and on the record, stressed that a grand jury has a duty to protect the innocent and I emphasized that a grand jury is an independent body, separate and apart from investigative agencies and that grand juries are not an arm of the prosecution but instead, they have a duty to examine the government's case carefully. I didn't tell them that they couldn't appoint IRS agents as their own "agents", because it never occurred to me that there could be such a blurring of the "investigative agency", "prosecuting attorney" and "grand juror" functions. However, I did supply each grand juror with a copy of the recommended instructions to grand jurors authored under the auspices of the Judicial Center, and I urged each grand juror to read the instructions frequently to be sure that they adequately performed their duties. (I now urge that Justice Department prosecutors read them). Those instructions say in important part:

"You will recall from my earlier remarks that the grand jury developed in England as an entity independent from the king to protect a subject from an unwarranted prosecution. The king could not charge a subject with a serious crime without first submitting evidence and witnesses to a grand jury, which then decided whether to return an indictment against the accused person.

Just as the English grand jury was independent of the king, the federal grand jury under the United States Constitution is independent of the United States Attorney, the prosecutorial agent of the executive branch of the federal government. The grand jury is not an arm of the Federal Bureau of Investigation; it is not an arm of the Internal Revenue Service; just as it is not an arm of the

United States Attorney's Office. There has been some criticism of the institution of the grand jury for allegedly acting as a mere rubber stamp approving prosecutions that are brought before it by government representatives. Similarly, you would perform a disservice if you did not indict where the evidence warranted an indictment.

As a practical matter, you must work closely with the government attorneys. The United States Attorney and his assistants will provide you with important service in helping you to find your way when confronted with complex legal matters. It is entirely proper that you should receive this assistance.

However, you must remember that you are not the prosecutor's agent. Your role is related to but clearly distinct from that of the government attorneys who will assist you, and it is important that you keep the distinction between the roles clearly in mind. Although you must work closely with the government, you must not yield your powers nor forego your independence of spirit.

These comments are meant to be cautionary in nature. The government attorneys are sincere men and women, and you will develop ordinary human feelings as you work with them during your term of service. If past experience is any indication of what to expect in the future, then you can expect candor, honesty, and good faith efforts in every matter presented by the government. However, it is because you may tend to expect such high quality from the government's agents that there is a potentially grave risk to your independence of thought and action, which may cause you to lapse into reliance when you should be dubious or questioning.

You should also remember that the government attorneys are advocates of the government's interests. They are prosecutors; you are not. While they will usually balance fairly the government's interest against the interest of a citizen's personal liberty, it is your responsibility to ensure that the proper balance is achieved in every case brought to your attention. You must exercise your own judgment, and if the facts suggest a different balance than that advocated by the government attorneys, then you must achieve the appropriate balance even in the face of their opposition or criticism."

In the face of these instructions, the grand jury wasn't two minutes into its investigation when one of the Justice Department lawyers personally administered an "oath" to an IRS Special Agent, and that "oath" was:

"Mr. Mendrop, do you swear to carry out the duties as directed by the Foreman and Members of the Grand Jury, keep all proceedings of matters and documents which are received pursuant to your work with this grand jury secretive?" (sic).

In its brief the government says:

"The government concedes that Mr. Snyder had no authority to administer oaths to agents. However, Mr. Snyder will testify, and the record will reflect, that the agents were first given an oath by the foreman. It was only after they had been sworn in by the foreman that Mr. Snyder gave the agents what purported to be an additional oath directing the agents to maintain secrecy."

[As has been noted, this testimony hasn't been presented yet, and on the sworn record made to date, it is not clear who gave an oath to testify truthfully.]

The government then "quotes" from the transcript which shows that those were the facts. That's not what the transcript which was supplied to me shows, and I am concerned about the validity of someone's transcript. It is true that other "oaths" administered by Mr. Snyder do appear to have followed an oath administered by someone to testify truthfully, but if any such oath was administered to Mr. Mendrop at the first session, it doesn't show up in my copy of the transcript.

Six months later, the Special Agents of the IRS were each sworn as an "agent" of the second grand jury, and if there could be any doubt as to the mingling of the investigative agency/prosecutorial/grand jury functions, the hash which results from the following proceedings eliminates that doubt. After a statement by government counsel that he wanted the agent sworn as an "agent of the grand jury", this job description was furnished by Mr. Snyder:

> "...when he interviews people and he looks at this stuff, he is not looking at it so much as a special agent of the criminal investigation division of the Internal Revenue Service, and he is looking at (it) as your agent and he is amendable to you and he is amendable to Rule 6. Do you recall Rule 6, the Grand Jury secrecy?
>
> *"What it is, is very, very plain, and it states in what capacity he is operating in this investigation so there is no question about it.*
>
> (The agent was then sworn as a witness by someone, and the transcript continues)
>
> "MR. SNYDER: Do you have the oath to make him a—they don't have the oath. Raise your right hand. Do you solemnly swear that the information and evidence which you receive pursuant to the Grand Jury you will keep secret to yourself *except as provided by the foreman of the Grand Jury* or federal judge? ... In the course of your *duties as a special agent and also as an agent of a previous grand jury* have you conducted an investigation into the affairs of one William A. Kilpatrick?"

I don't know how it could be any clearer than in Mr. Snyder's eyes, the agent's investigation was a combined IRS and Grand Jury investigation conducted by a single "agent", and, of course, under Rule 6 he was the prosecuting attorney's little helper. That isn't what the stock instructions to grand jurors say should be done, and, although the government argues that other grand juries have had agents, it fails to come up with a case approving the practice

and it fails to mention any case discussing the blurring of functions. The government relies on *United States v. Cosby,* (1979) 5 Cir., 601 F.2d 754. There, the court itself challenged the practice of appointing an "agent of the grand jury", but it "assumed" that the practice was proper because it reversed the case on other grounds. The opinion cites several cases where "the use of third parties to assist grand juries has been considered and approved," but it is to be noted that those cases were decided before the amendment of Rule 6(e) which makes no mention of grand jury "agents" and which says that disclosure may be made to government lawyers for use in the performance of duty, and to other governmental personnel "as are deemed necessary by an attorney for the government *to assist an attorney for the government in the performance of such attorney's duty to enforce federal criminal law."* The rule doesn't permit the grand jury to have an "agent", and it categorically says that Rule 6(e) permits disclosure to non-lawyers for the single purpose of assisting the "attorney for the government". The rule doesn't mix up the separate functions of prosecutor and grand jury, and with Rule 6(e) clarified, those functions cannot be blended.

My thoughts on this score are in full accord with those of the Advisory Committee, because its note to the 1972 amendment to Rule 6(e) says:

> "Federal crimes are 'investigated' by the FBI, the IRS, or by Treasury agents, *and not by government prosecutors or the citizens who sit on grand juries."*

Here, the "Grand Jury Agents" investigated and they testified, all the while being special agents of the IRS, and, as will be detailed later, a government prosecutor "investigated" on the streets of Puerto Rico.

The government concedes the obvious. A lawyer employed by the Tax Division of the Department of Justice can't administer oaths, but, sworn or unsworn, I don't think that an IRS special agent can act in the

combined capacity of IRS Agent, "Agent for the Grand Jury" and recipient of grand jury information supplied under Rule 6(e) for the sole purpose of helping out the prosecutor. This is a confusion not of apples and oranges. It is confusing apples, oranges and bananas.

Admitting impropriety in the conduct of counsel, the government's brief argues that the error wasn't serious and that it resulted from good motives of Mr. Snyder. The error may or may not be serious, and I express no opinion as to the gravity of the error. However, the government is playing with fire in arguing that good motive excuses making one's own law. I discussed my thinking of this argument at quite some length in *United States v. Best,* (1979) 476 F.Supp. 34, where I ruled that a belief that blocking some railroad tracks would save the world from nuclear devastation didn't excuse the offense, and the Tax Division has surely heard tax protestors say that their motives in refusing to obey the tax laws are pure as the driven snow. Mr. Snyder's good intentions don't excuse his arrogation of a power he didn't have. And, even if the illegal "oath" doesn't amount to serious error, it started the case downhill on a course of repeated excesses on the part of the prosecution. Good intentions or ignorance of the law don't make those errors go away. The creation of the "office" of grand jury agent is harder to excuse when the impartial jurors' "agent" is a chief investigator of the IRS case against the defendants and is receiving grand jury information under Rule 6(e) only to help out the attorney for the government charged with the supervision of presentation of the government's case to the grand jury.

What has been said thus far, and much of that which is to follow, bear in no way on the trial itself, and, therefore, those things can't enter into a decision of whether a new trial should be granted. That which took place during the grand jury proceedings and most of that which took place outside the presence of the jury couldn't poison the jury verdict, and these alleged transgressions are argued in support of the motion to dismiss because of prosecutorial misconduct and in support of claimed lack of professionalism of government counsel. Therefore, insofar as possible, I shall try to discuss the arguments bearing on the new trial motion in a separate part of this memorandum.

In a brief filed by trial counsel (not signed by present counsel for the government and not adopted by Colorado's United States Attorney whose typewritten signature does appear) the many accusations were described as "silly", but they aren't either silly or frivolous. Indeed, the brief filed by trial counsel was couched in language far different from that which the court is accustomed to reading. When asked, Mr. Scharf said that higher authority in the Justice Department Tax Division had approved the brief and its phraseology, and that higher authority thought the whole thing was a ploy of defense counsel. If that be so, the lawyers in the upper echelon of the Tax Division have adopted a style of brief writing markedly different from that Justice Department lawyers have filed with this court in the past, and I have had my fair share of experience in dealing with Tax Division lawyers for whose ability and ethics I have the highest regard. And, if the overlords of the Tax Division think this whole mess is just a ploy, I recommend that they take a second look.

Since I started this with the grand jury proceedings, I think that I should continue with them and with matters which occurred during the trial which don't impact on the new trial motion but which are aimed at the dismissal motion and lack of professionalism. I think that the place to start is with Rule 6(e), F.R.Cr.P. itself, because that is the rule which governs grand juries and it is the rule which was violated here. I quote from Rule 6(e) and I italicize the phrases in that section which are of importance to this case:

"(e) Recording and Disclosure of Proceedings.

"(1) All proceedings, except when the grand jury is deliberating, shall be re-

corded stenographically or by an electronic recording device. An unintentional failure of any recording to reproduce all or any portion of a proceeding shall not affect the validity of the prosecution. *The recording or reporter's notes or any transcript prepared therefrom shall remain in the custody or control of the attorney for the government* unless otherwise ordered by the court in a particular case.

"(2) A grand juror, an interpreter, a stenographer, an operator of a recording device, a typist who transcribes recorded testimony, *an attorney for the government, or any person to whom disclosure is made under paragraph (3)(A)(ii) of this subdivision shall not disclose matters occurring before the grand jury* except as otherwise provided by these rules. *No obligation of secrecy may be imposed on any person except in accordance with this rule.* A known violation of Rule 6 may be punished as a contempt.

"(3)(A) Disclosure otherwise prohibited by this rule of matters occurring before the grand jury, other than its deliberations and the vote of any grand juror, may be made to—

"(i) an attorney for the government for use in the performance of such attorney's duty; and

"(ii) such government personnel as are deemed necessary *to assist an attorney for the government in the performance of such attorney's duty to enforce criminal law.*

(I don't know how it can be argued that this language permits disclosure to IRS agents to work as "agents for the grand jury" unless it is argued that the grand jury is simply an arm of the prosecutor's office, and if that be the argument, almost 800 years of history is going to have to be forgotten. The document King John signed at Runnymede contains no such concept, nor does our Constitution.)

"(ii) such government personnel *as are deemed necessary by an attorney for the government to assist an attorney for the government in the performance of such attorney's duty* to enforce federal criminal law.

(It seems pretty clear to me that the IRS agents to whom disclosure was made were hired guns of the prosecutor and the IRS—not of the grand jury.)

"(B) . . . An attorney for the government shall promptly provide the district court, before which was empanelled the grand jury whose material has been so disclosed, with the names of the persons to whom such disclosure has been made. (The language of the rule is this clumsy.)

"(C) Disclosure otherwise prohibited by this rule of matters occurring before the grand jury may also be made. .

.    .    .    .    .

"(ii) when permitted by a court at the request of the defendant, upon a showing that grounds may exist for a motion to dismiss the indictment because of matters occurring before the grand jury.

If the court orders disclosure of matters occurring before the grand jury, the disclosure shall be made in such manner, at such time, and under such conditions as the court may direct."

I first mention something not raised by defense counsel, but defense counsel had no way of knowing anything about it. I found out about it from a scanning of the full file drawer of grand jury transcript. A while back, it was the practice to make grand jury witnesses take an oath of secrecy, and this is still the rule in some state court systems. Because of public outcry, the rule was changed, and, as has been seen, this is now verboten because of the language of the rule saying, "No obligation of secrecy may be imposed on any person except in accordance with this rule." This language has been uniformly interpreted to prohibit any instruction to a witness that his testimony is secret. *In re Langswager,* (1975) D.C.Ill. 392 F.Supp. 783; *In re Grand Jury Witness Subpoenas* (1974)

D.C.Fla. 370 F.Supp. 1282; *In re Alvarez* (1972) D.C.Cal. 351 F.Supp. 1089; *In re Minkoff* (1972) D.C.R.I. 349 F.Supp. 154; *In re Investigation before April 1975 Grand Jury* (1976) D.C.Cir. 531 F.2d 600; *In re Vescovo Special Grand Jury* (1979) 473 F.Supp. 1335, and many other cases. In spite of this express command of Rule 6(e), secrecy obligations were imposed on several witnesses, and, to make the violation more disturbing, secrecy obligations were imposed on lawyers called to furnish information concerning their clients. That makes the violation gravely beyond the pale, because of the impossible position the lawyer-witness is placed in, but that's what the grand jury transcript discloses. No "oath" of secrecy was administered, but an obligation of secrecy was imposed by instructions from government counsel to witnesses. This foolishness may or may not have been intentional, but ignorance of the law is not a defense available to a prosecutor. This misconduct is established by the record, and it will prove difficult for the government to deny, just as the government had to admit the attempted administration of an "oath" by Mr. Snyder. The government surprisingly defends the proven mishmash of function of the IRS Special Agent/Grand Jury Agents/Assistants to the Attorney for the Government appointed under Rule 6(e), but maybe it thinks that admitting that this was error would confess the motion to dismiss.

I come now to other accusations made by defendant and pretty much denied by the prosecutors and IRS agents. I make no finding as to whether most of the charges are proven or unproven, but I do find that as to all assertions made by defendant there is cause for concern that the prosecutor's conduct before the grand jury may require dismissal of the indictment. The accusations are made sincerely; there is some evidence to support all of them, and there is quite a bit of evidence to support some. However, before factual findings can be made, a further hearing permitting participation by all parties interested in the grand jury proceedings is necessary—something which will be explained later. Most importantly, of course, the testimony of government counsel is essential, and it is still missing although all three of the lawyers were in Denver during the last hearing.

Because that additional hearing is required, I shorten discussion of most of the claims of prosecutorial misconduct, but I shall comment briefly on them. Frequently I will phrase the charges as if the facts had been established, but I emphasize that I am not saying that the facts have been proven. I am just adopting the practice of the government in phrasing an indictment in language saying that thus and so are the facts. I am only phrasing the defendant's charges against the government in the same way the government phrases its charges against a defendant, and the fact that the charges are made is not evidence that they are true, nor do I find that they are.

Richard Birchall is a lawyer formerly with the Tax Division who practices in New Jersey and who did some work for defendant and his company. He was subpoenaed to testify before the grand jury, and he showed up in Denver pursuant to the subpoena. He says that he met Mr. Snyder and the agents in a bar and they downed a few drinks paid for by Mr. Snyder. During this session Mr. Snyder supposedly disregarded the secrecy rules and, having done so, he told Mr. Birchall he was a potential target. He added that there was testimony about a personal relationship of Mr. Birchall's, a comment which was bothersome to the witness because of marital problems of Mr. Birchall. These communications are of a nature (if they were made) designed to bring about hurried cooperation from a witness, and especially from a witness who is a former Tax Division lawyer practicing tax law in the private sector. While in Denver, Mr. Birchall was left in a room with some grand jury transcripts and material lying on a table in plain sight. Mr. Birchall scanned some of the material trying to locate that which dealt with the matters discussed by Mr. Snyder. Perhaps

he shouldn't have done this, but this is a matter of morals while grand jury secrecy is a matter covered by Rule 6, and Mr. Snyder was under it, but Mr. Birchall wasn't. Moreover, Mr. Birchall testified that he thought that he was being threatened by Mr. Snyder, and he was reacting to the threats. I pass no moral judgment on what happened because that's not the question to be decided in this case.

This doesn't end the accusations made through Mr. Birchall's testimony. He said that Mr. Snyder tried to persuade him to breach his ethical duty of confidentiality and he attributed to Mr. Snyder a remark that even if the defendant wasn't guilty, the government would "break him" with the cost of the defense. These accusations go to the heart of our system of justice, and it was no ploy on the part of defense counsel to bring the accusations out for public scrutiny.

Professor Roland Hjorth teaches tax law at the University of Washington Law School, and he is a recognized expert who was employed by defense counsel on the recommendation of the professor of tax law at the University of Michigan. At the request of defendant, Professor Hjorth was permitted to testify as an expert before the grand jury. His views of tax law differed markedly from those of Mr. Snyder, who bragged on frequent occasions that he had never taken a course in taxation and knew almost nothing about it. Nevertheless, Professor Hjorth was browbeaten and ridiculed by Mr. Snyder, and some of the conversation so out of place for an ethical prosecutor took place during a recess in the hearing of some grand jurors. The government's post trial brief says as to this breach of ethics and standards of common courtesy:

"It was poor judgment on the part of Mr. Snyder to carry on a conversation with Professor Hjorth while two grand jurors were present. However, the record fact is that there was no disclosure of Grand Jury material during the conversation."

I'm not so sure about that. The record shows that the argument and ridicule was as to that which Professor Hjorth had testified to, and that persons other than grand jurors could hear the argument. However, even if the government is correct in this statement, the fact is that the argument begs the real question. Professor Hjorth also testified that as a result of Mr. Snyder's conduct, he would never again appear as an expert witness. Intimidating witnesses by telling them that their testimony disgraces them and implying that the Tax Division of the Department of Justice will take after the witness and will complain to the University of Washington Law School because an expert testified to his expert opinions does no credit to our government. I think that the government's argument in its post trial brief is unconvincing, and, seemingly, the professor's testimony isn't seriously contested. I hope that we haven't gotten to the point that disagreement with the legal concepts of the IRS provides grounds for attacks by that bureaucracy because sometimes the IRS is wrong. *U.S. v. Sells Engineering* (1983) — U.S. —, 103 S.Ct. 3133, 77 L.Ed.2d 743 and *U.S. v. Baggot,* — U.S. —, 103 S.Ct. 3164, 77 L.Ed.2d 785.

Peter Parrish is a former IRS agent who is now employed as an accountant and who worked for defendant. He said that when he responded to a subpoena, he was interviewed by Mr. Blondin and matters which took place before the grand jury were discussed. He also said that the discussions could be heard by outsiders. I don't approve this casual approach to witness interviews, but I think that the incident is picayune. It doesn't deserve discussion.

To further muddle the status of the Special Agent/Grand Jury Agent/Assistant to the Prosecutor matter, letters were written on the letterhead of the United States Attorney for the District of Colorado, and they were signed by the IRS agents with an explanatory line under their signature saying that they were "Special Agents". The letters were authorized by Justice Department attorneys, but they were not authorized by the United States Attorney in Colorado. Apart from the fact that IRS

agents who claim to be "agents of the grand jury" shouldn't be using the U.S. Attorney's letterhead, the identity of the persons and the transactions which were under grand jury scrutiny shouldn't be disclosed to anyone by letter or otherwise, but these startling letters did precisely that. I can't fault the IRS agents for this because the government's brief says as to these singular letters:

> "Mr. Blondin and Mr. Snyder on these occasions asked the agents to send out correspondence and to sign the letters for them, after having the contents of the letter read to them over the phone. On no occasion, did the agents who were acting under the direction and control of Mr. Snyder, Mr. Blondin and the United States Attorney's Office sign any such letters without advance authority from the government's attorneys."

The United States Attorney for the District of Colorado has disavowed the letters written on his letterhead, and he has seen to it that this won't happen again.

Thus, the disclosures were made with knowledge of Tax Division lawyers and the IRS agent signatures on U.S. Attorney stationery were approved by them. The government has cited no authority for this novel procedure by which the nature of that which was going on before the grand jury and the identity of a target was certified to in writing on the letterhead of the U.S. Attorney who was not running the investigation. Once more, I attribute no fault to the U.S. Attorney.

In recent years, the use of "pocket immunity" has become prevalent. The phrase, for the benefit of the uninitiated, refers to a practice of ignoring the Congressional mandate as to how immunity can be granted and instead of doing what Congress commands, informally substituting a "deal" struck between a prosecutor and a witness. The enforceability of the side agreement in the federal court is an open question, but I have never heard it even argued that federal pocket immunity applies to a state court prosecution. However, when it is coyly suggested that a lawyer's client is a target of a grand jury inquiry and that the client can escape the range of fire by incriminating himself along with someone else, the carrot proffered by the prosecutor is hard to resist. Not unimportant, of course, is the fact that the pocket immunity need not be included in statistical reports showing the number of immunities granted in federal prosecutions. (These statistics have been of interest to Congress in the past, and I believe that they still are.)

The deal is a good one for both sides, but it skirts the law. It can be granted on a local level by lawyers not authorized to approve the grant of formal immunity, and no report of its use is required. Formal immunity would have required the approval of the United States Attorney and a designated Assistant Attorney General. But pocket immunity can be granted at the whim of any lawyer running a grand jury, and there is no public record of the side deal. Here, the United States Attorney didn't authorize nor did he approve the immunities. In fact, he didn't know anything about them, although statutory immunity requires his okay.

The history of immunity statutes, colonial, state and federal, is set out in footnotes to *Kastigar v. United States* (1972) 406 U.S. 441, 92 S.Ct. 1653, 32 L.Ed.2d 212, and the present immunity statute enacted in 1970 is there discussed, as is the Congressional intent in its enactment. The intent as to the formality of grants of immunity is quite plain. 18 U.S.C. § 6002 effectively recognizes privilege against self-incrimination up to the point "the person presiding over the proceeding communicates to the witness an order issued under this part," to testify. The preliminaries to obtaining such an order are spelled out in 18 U.S.C. § 6003, and they are:

1. There must be a request for the order *made by "the United States attorney for such district."*

2. The request by the United States Attorney for the immunity grant *must then be approved by "the Attorney Gen-*

*eral, the Deputy Attorney General, or any assistant Attorney General."*

3. There must be a certification that the testimony may be necessary for the public interest and that the witness has refused or is likely to refuse to testify because of his privilege against self-incrimination.

At that point, a district judge performs the ministerial act of signing the immunity order. *In re Corrugated Container Antitrust Litigation* (2nd Cir.1981) 644 F.2d 70, *In re Daley*, (7th Cir.1977), 549 F.2d 469. The order typically tracks § 6002 and says that "no testimony or other information compelled under the order . . . may be used against the witness in any criminal case, except a prosecution for perjury, giving a false statement, or otherwise failing to comply with the order." This was the statute which was analyzed in *Kastigar v. United States* (1972), 406 U.S. 441, 92 S.Ct. 1653, 32 L.Ed.2d 212, in which the old case of *Counselman v. Hitchcock* (1982) 142 U.S. 547, 12 S.Ct. 195, 35 L.Ed. 1110, was explained and distinguished. In *Kastigar* it was held that the statute did not grant transactional immunity and that the grant was limited to use. "The statute, like the Fifth Amendment, grants neither pardon nor amnesty. Both the statute, like the Fifth Amendment allow the government to prosecute using evidence from legitimate independent sources." When the statute is followed, there is a formal, understandable record of the immunity granted and its extent, but, with pocket immunity, no one is sure what the deal is, and there is no adequate record—statistical or otherwise. An underlying purpose of the statute is to reduce to written record the identities of persons granted immunity to permit necessary comparison at a later time of their relative guilt, as compared with persons not let off the hook. With the informal pocket immunity, only a few of the grants come to light, and clear Congressional purpose behind the law is defeated. The statute cannot be read to mean anything other than a limitation on immunity grants to requests made by a "United States Attor-

ney", approved by "the Attorney General, the Deputy Attorney General, or any assistant Attorney General". Congress did not delegate to Tax Division Assistants any right to formally or to informally deal out immunity to the objects of their bounty, but here persons identified as targets of the grand jury were later bargained out of the case by Messrs. Snyder and Blondin. Whether there was any approval of the gifts of pocket immunity, and if so, by whom, I know not, but I do know that there was not compliance with 18 U.S.C. §§ 6002–6003, and I do know that the United States Attorney did not authorize the pocket immunities granted by Tax Division lawyers.

This is especially troublesome in this case in light of the record made concerning the witness Richard Bell who was allegedly targeted by the grand jury (or at least by Mr. Snyder and Mr. Blondin). Mr. Bell was represented by his brother, Malcolm, an attorney practicing in New York City, and a witness I found to be straightforward, fair, convincing, and most generous to Mr. Snyder. Malcolm Bell succumbed to the carrot of pocket immunity for his brother, but, later he was told by Mr. Snyder that if Richard "testified for Mr. Kilpatrick, all bets are off." Maybe this meant that if Mr. Bell perjured himself he would be prosecuted for perjury, but if the immunity statute had been followed, the nagging question of the meaning of "all bets are off" wouldn't confront us. Under the statute, all bets weren't off if Richard Bell testified for Mr. Kilpatrick, although he could have been prosecuted for perjury if he testified falsely, but incriminating testimony given by him couldn't be used in a prosecution of the charges with which he was threatened. If the statute had been followed, the government couldn't welch on the bet of not using any incriminating testimony and I doubt that it can welch on that bet when the immunity grant is in pocket form. All too often, pocket immunities are carelessly granted, and sometimes they grant transactional immunity which Congress has not authorized. It is not surpris-

ing that there was uncertainty and misunderstanding in this instance. Grand jurors can't be expected to know the requirements of law concerning lawful immunity grants, and if the prosecutor ignores the statute, the grand jury should be told that witnesses are testifying under a side deal made with the witness by the prosecutor. The nature and informality of the immunity grant might bear on a grand juror's evaluation of the credibility of a witness, especially if the grand juror knew of the short cut used by the prosecution.

James Treece is a former United States Attorney for the District of Colorado. He was representing one of the targets of the grand jury investigation, and he was served with a subpoena duces tecum to produce records before the grand jury. He told the IRS Special Agent/Grand Jury Agent/Assistant to the prosecutor who served him that he had no such records in his possession, to which the agent, speaking in which capacity I know not, responded, "You're a liar." I guess that at this point this "man of many occupations" decided to act as a grand juror and pass on credibility. That this was said is denied, but I cannot disregard the testimony. I have no knowledge that any such comment was communicated to the grand jury, but Mr. Treece was required to testify after being called a liar by the "grand jury agent", and although I doubt that Mr. Treece was intimidated, other witnesses would have been.

We have not one but two problems under *Massiah v. United States*, 377 U.S. 201, 84 S.Ct. 1199, 12 L.Ed.2d 246. With full knowledge that he was represented by counsel, Declan O'Donnell appeared before the grand jury against the advice of his counsel, and that advice was known to the prosecutors. The government argues that O'Donnell was a lawyer and that he appeared voluntarily. I don't think that this is any answer to *Massiah*, although I concede that the case deals with an indicted defendant and O'Donnell was not then indicted. The government excuses its conduct saying it is permitted under *Edwards*

*v. Arizona*, 451 U.S. 477, 478, 101 S.Ct. 1880, 1881, 68 L.Ed.2d 378. I don't think that *Edwards v. Arizona* is apposite. That case has to do with *Miranda* rights, and, although the government asks that I read footnote 9 of the opinion, I think that footnote 8 has more to do with the *Massiah* problem. I do not rule that there was or was not a violation of *Massiah* in the case of Mr. O'Donnell's testimony before the grand jury because such a ruling is not necessary to this memorandum, but defendant's argument isn't frivolous.

Robert G. Morvillo is a prominent lawyer practicing in New York City, and his testimony was taken by telephone. He represented the Bank of Nova Scotia, and he testified concerning the activities of Mr. Scharf in going to Puerto Rico to play cop in a further and total blurring of the distinction between prosecutor and investigator. In its brief, the government sees no impropriety in this conduct, but I remind of the Advisory Committee's comment that "Federal crimes are 'investigated' by the FBI, the IRS or by Treasury Agents and not by *government prosecutors* or the citizens who sit on grand juries." (They surely aren't investigated by "reviewers", something next to be discussed) In any event, I have no doubt that when a prosecutor turns cop, he loses his *Imbler v. Pachtman*, 424 U.S. 409, 96 S.Ct. 984, 47 L.Ed.2d 128 prosecutorial immunity.

While in Puerto Rico, Mr. Scharf conducted a surveillance of some little girls and tailed them to their home. This let him question their mother as to the whereabouts of his prey who happened to be her husband, and who is a Bank of Nova Scotia employee. Of course, Mr. Scharf must have known that the wife couldn't have been compelled to testify to her husband's whereabouts, even under the lessened privilege adopted in *Trammel v. United States*, 445 U.S. 40, 100 S.Ct. 906, 63 L.Ed.2d 186. As an investigative technique tailing the little girls and quizzing the wife may have been brilliant police work, but I am quizzical as to the propriety of a lawyer questioning someone he knows he couldn't

question in court because of an absolute privilege which, according to *Trammel*, can be waived only with full knowledge of the incompetence to testify. It seems to me that whatever may be the obligations of an IRS agent, a prosecutor owes a duty not to question a wife about her husband's whereabouts unless *Berger v. United States*, 295 U.S. 78, 55 S.Ct. 629, 79 L.Ed. 1314 has been overruled, and it hasn't been. Totally apart from the propriety of Mr. Scharf's actions in Puerto Rico under *Trammel*, the witnesses were employees of the Bank of Nova Scotia, well known to Mr. Scharf to be represented by Mr. Morvillo. He says that interviews conducted by Mr. Scharf violate *Massiah;* the government says they don't, and I express no judgment as to who is right or wrong, but, undeniably, there is a problem, and I think that the problem was well known to Mr. Scharf when he visited Puerto Rico.

Next we come to still another confusion in who occupied what job. It seems that within the administrative procedures of the Department of Justice sometimes conferences can be arranged with "reviewers" who are higher ups in the Tax Division. Many lawyers are of the impression that the "reviewers" occupy a sort of quasi-judicial capacity to pass judgment on whether a case should be prosecuted, and that they are pretty much like the Appellate Staff on the civil side of the Tax Division. Experienced tax lawyers think that a "reviewer" is someone with whom compromise can be discussed. Moreover, from time immemorial, lawyers have dealt with one another in trying to settle cases in the belief that they can be straightforward without having their words thrown back at them at time of trial. The IRS hasn't always shared this view, and problems with the IRS played no small part in the enlargement of the coverage of the common law rule by the enactment of Rule 408 of the Federal Rules of Evidence. That rule now provides, "Evidence of conduct or statements made in compromise negotiations is likewise not admissable."

During the troubled history of this case, some lawyers were and some were not afforded the luxury of a conference with a "reviewer". Experienced tax lawyers think that a conference with a Reviewer offers a last ditch opportunity to avoid a criminal prosecution through negotiation, and memoranda are submitted to the Reviewer to analyze defense counsel's legal position. Conferences are then set up, attended by IRS agents, trial attorneys for the government, and defense counsel to present arguments pro and con for more or less impartial consideration by the Reviewer. Counsel for some targets were and some were not favored with a conference with a Reviewer, but those who were so favored met with one Jared Scharf acting as the Reviewer. Something which was not disclosed to defense counsel was that he was a behind the scenes prosecutor, and, not only was he a behind the scenes prosecutor, he was actually an investigator in the case.

Rule 6(e) says that the grand jury transcript shall "remain in custody or control of the attorney for the government". The transcript of this grand jury was in the custody and control of the IRS. After the indictments were handed down, the transcript was stored away from the United States Courthouse in a room obtained from the General Services Administration by the Internal Revenue Service. It was a room assigned to the IRS, and, if the United States Attorney wanted in, he would have had to get a key from the IRS Special Agents. One cannot help fretting about this violation of the express language of the rule, and *United States v. Sells Engineering, Inc.*, — U.S. ——, 103 S.Ct. 3133, 77 L.Ed.2d 743, coupled with *United States v. Baggot*, — U.S. ——, 103 S.Ct. 3164, 77 L.Ed.2d 785, decided a few weeks ago, don't lessen the concern as to why the IRS retained custody of the transcripts which the rule unambiguously says should be under the control of the United States Attorney and only the United States Attorney.

There is testimony that Mr. Snyder threw his jacket on the floor and mouthed

obscenities at me as I left the bench. I didn't see anything like that, and the conduct is denied. I don't know whether he did or didn't do any such thing.

When I recessed court one day, the players were in their usual positions. Mr. Snyder, Mr. Blondin, Ms. Surbaugh, and an IRS agent were seated at plaintiff's table. Mr. Scharf was in his bleacher seat, a couple of rows back in the spectator's section where he always sat while the jury was in the courtroom. It was only when the jury left the courtroom that he sat at the counsel table and became an active trial participant. Because of suspicions I had based on testimony in the case (suspicions enhanced by post trial testimony) I was concerned about possible violations of *Massiah,* and I cautioned one and all that I didn't want the rule violated. I started to leave the bench, and Mr. Scharf yelled at me (he says that he spoke in a loud voice, but the dictionary I have suggests that the difference between a loud voice and a yell is quibble). Mr. Scharf's discourtesy amused me more than it offended me, but, according to that which has been said in the post trial hearings, members of the public were distressed that a government lawyer would shout at the judge from the spectator's section of the courtroom. I thought that my court reporter's comment as we left the courtroom was discerning. She said that if her five year old son did something like that he would be sent to bed without his supper.

Rule 6(e) was amended to change the procedure for disclosure of grand jury information to "such government personnel as are deemed necessary by an attorney for the government to assist an attorney for the government in the performance of such attorney's duty to enforce the criminal law." No court permission for the disclosure is required, and the rule is complied with if the attorney for the government "promptly provide(s) the district court ... with the names of the persons to whom such disclosure is made." As I read it, any "attorney for the government" can promptly provide the information, and any "attorney for the government" can make the decision to disclose. I have no fault to find with the paper trail left in this matter insofar as the disclosure requirements are concerned. I am troubled about testimony suggesting that authority to make the disclosure decisions was delegated to the IRS Special Agent/Grand Jury Agents/Prosecutor's helpers. Under common law rules of agency, this authority couldn't be delegated to a subagent, and, especially it couldn't be delegated to an IRS agent whose fellow workers were aiming at the defendants from a different angle. My worry on this score is not lessened by an IRS letter in evidence saying that making a civil tax case under the administrative process would be difficult. *United States v. Sells Engineering* and *United States v. Baggot,* both *supra,* which settle the question of using a grand jury to collect taxes.

At the post trial hearing, Donald D'Amico, a witness called by the government, testified as to his appearance before the grand jury. He said that in the presence of the grand jury, Mr. Snyder threw his arm around his shoulder and whispered, "Don't let them cut you up." Then Mr. Snyder introduced him to the grand jury with a glowing recitation of Mr. D'Amico's war record and said, "We have a genuine war hero." After that, Mr. Snyder read off a list of names and asked if the witness would take the Fifth Amendment if inquiry was made concerning those persons. Upon receiving an affirmative answer, the witness was excused from further testimony, and it was not until the post trial hearing that Mr. D'Amico received oral pocket immunity. From what was said at the hearing I glean that counsel for Mr. D'Amico had discussed the grand jury testimony before the witness was called, and why he was called just to claim his privilege remains unexplained.

Bernard Bailor was called as a witness by the government. He is a lawyer of long experience with the Tax Division of the Department of Justice, and I was impressed with his knowledge and with his candor. He said that if a case is being

prosecuted by a United States Attorney, it is not unheard of to have a Reviewer assigned to assist in a trial if the United States Attorney so requests, but that when a case is being prosecuted by Tax Division lawyers, it would be most unusual to have a Reviewer act as a trial attorney. He also summarized the security given grand jury material in a major case he handled, and that security was far greater than the security in this case. He made the statement that abuse of the grand jury process should bring about a dismissal of the indictment.

█ I think that I have talked enough about the grand jury to explain why I think there has been more than an "adequate showing that grounds may exist for a motion to dismiss the indictment because of matters occurring before the grand jury." There is such a motion, and, accordingly, I act under the provisions of Rule 6(e)(3)(C) which says that disclosure of grand jury matters may be made "when permitted by the court at the request of the defendant, upon a showing that grounds may exist for a motion to dismiss the indictment because of matters occurring before the grand jury." The Advisory Committee note to Rule 6 requires a "preliminary factual showing of serious misconduct" and I am convinced that the requirement has been met. I guess that technically, the requisite "request" to examine the entire grand jury transcript hasn't been made, but in light of this memorandum, I am sure that it will be. I have scanned the transcript, but I haven't had time to study it, and, even if I had the time, nuances recognizable by counsel wouldn't be apparent to me. Because of the showing made as to the claims of prosecutorial conduct, and without finally ruling that there was or was not any such misconduct, I order that the entire grand jury transcript dealing with this indictment be made available for study by defense counsel. Defense counsel say that a grand juror who is also a lawyer, if permitted, would testify that Mr. Snyder oppressed witnesses before the grand jury and that he was overbearing and discourteous. I leave to another judge to decide whether this evidence should be received.

The rule says, "If the court orders disclosure of matters occurring before the grand jury, the disclosure shall be made in such manner, at such time, and under such conditions as the court may direct." The conditions follow: Disclosure shall be made to counsel and only to counsel. Paralegals shall not be used as substitute lawyers, and only members of the bar shall examine the transcript. They shall hold secret matters they learn, and they shall discuss them with no one other than co-counsel, and, insofar as necessary to the preparation of their arguments, with their clients. Typists given direct or indirect information concerning the content of the transcript shall receipt for a copy of a written order commanding that they hold secret any information learned by them as to what took place before the grand jury, and those receipted orders shall be filed with the clerk. During the time a transcript is being used to prepare arguments in this case, counsel shall be personally responsible for its secrecy, and when not in actual use, the transcript shall be placed in locked storage to which only counsel have access. When need for the transcripts no longer exist, all copies of it shall be returned to the United States Attorney to remain in his custody and control. All briefs disclosing grand jury testimony shall be sealed.

I make this ruling because I think that disclosure of the transcript is necessary in the interest of justice, and I make it because of recent action by the United States Court of Appeals for the Tenth Circuit. I also have in mind that which I anticipate the future holds in store for me. I noted earlier that Judge Kane has dismissed all except one count of the indictment, and the government has appealed his ruling. Because the prosecutorial misconduct, if proven, may result in a dismissal of the entire indictment, the Court of Appeals has ordered a partial remand to permit full development of the facts by all defendants. The remand is of such recent date that other defendants cannot be adequately prepared, and they should be permitted to participate in the matter to whatever extent they desire. They may be satisfied with the rec-

ord made, or they may want to expand on it. Even defendant Kilpatrick's lawyers may want to expand the record after reading the full transcript. I cannot, and I do not rule on the motion to dismiss. I earlier asked for suggestions as to remedy, and the government has said that such suggestions are premature. I think that is correct. Dismissal is a possibility under a theory of a totality of the circumstances, and it is because proof of repeated misconduct is necessary to order dismissal that I have discussed the many accusations. See, *U.S. v. Gold,* (1979) D.C.Ill. 470 F.Supp. 1336. But dismissal is a last resort seldom used. *U.S. v. Narciso* (1976) D.C.Mich. 446 F.Supp. 252. Contempt is a possibility, and it is the remedy usually suggested. See, *U.S. v. Hoffa* (6th Cir.1965) 349 F.2d 20, *U.S. v. Dunham Concrete Products* (5th Cir.1973) 475 F.2d 1241, *U.S. v. District Court* (4th Cir.1956) 238 F.2d 713. Disciplinary proceedings are a possibility, and the government has advised that "all of the allegations under consideration have been referred to the Office of Professional Responsibility" of the Department of Justice. Our local committee on conduct would also have jurisdiction of some of the matters.

Because further hearings are essential to a ruling on the motions to dismiss, and, perhaps, because Rule 605 of the Rules of Evidence, but more importantly because I plan to quit the judging business before the hearings can be completed, I make no ruling on and I intimate no belief as to what should be done with the dismissal motions. This decision will have to be made by Judge Kane, as will all other decisions concerning remedy.

No defendant other than defendant Kilpatrick is interested in the motion for new trial, and I am the only judge who should rule on it because I was there and watched in amazement the trial's conduct. But little discussion is necessary to this ruling. I have talked about the testimony of Richard Bell and his brother. I heard that testimony outside the presence of the jury, and I wouldn't let the jury hear it. I think that

was an error, and I don't think that I should put the parties to the expense of having the Court of Appeals tell me it was error. The witness was a key to the prosecution's case, and testimony as to the alleged pressures was important to an evaluation of his credibility. The pocket immunity and the circumstances of its grant bear on credibility. I initially thought that the testimony went only to prosecutorial misconduct which is for the court to determine, and I overlooked the credibility aspect of the implied threat coupled with the pocket immunity grant just as I overlooked the right of the jury to know that immunity wasn't granted the way Congress says it shall be. The jury should have heard the testimony and it might have changed some juror's mind. As a trial lawyer I didn't like the phrase "harmless error", and as a trial judge I don't use it when the error has any substance at all. This error has substance.

██ One Wilson Quintela was subpoenaed by the government, and he was arrested as a material witness. The prosecutors exercised a power possessed only by the court, and they released the man from subpoena. He promptly returned to his home in Brazil. Lawyers can't substitute themselves for the court to release a witness from subpoena. *U.S. v. Sanchez* (2nd Cir.1972) 459 F.2d 100. At the time of trial, the government admitted that their conduct was in error, and every effort was made to get the witness to come back from Brazil when defense counsel said that he was relying on the availability of the witness. After the trial started, the government said that the witness would return, but defense counsel said at that point he had developed his trial strategy on the basis of the release of the witness from the subpoena. He may have correctly thought that an interruption of the trial to permit travel from Brazil would be detrimental. That the government was guilty of no evil intent I am sure, but that the defendant suffered no harm I am not sure. Standing alone, this is one mistake I might reluctantly say was "harmless error", but coupled with other things, I can't so rule.

If there is any one thing that Tenth Circuit has been vehement about it is expressions of personal opinions by counsel as to whose testimony they believe. That rule was violated here, and I suggest that a review of the grand jury transcript may show frequent violations of the rule during grand jury proceedings. My thinking on this score goes immediately to the appearance of Professor Hjorth before the grand jury. I jumped in during final argument to try to lessen the error of the comment, but I doubt that I cured it.

It is argued that in the presence of the jury one of the agents stared at and laughed at the defendant. The prosecution says that this didn't happen, and that if it did, I would have seen it. I didn't see it, but that doesn't mean that it didn't happen, because no judge sees everything which goes on in a courtroom. This is especially so because I was concentrating my attention on Mr. Scharf's glowering as he sat in the second row of the spectator's section, and I doubt that defense counsel could see him. I mention this only because it is one more tiny aspect of the atmosphere of the trial. It was an atmosphere of unfairness and overreaching illustrated in small degree by ex parte telephone calls to my law clerk made by government counsel inquiring through the back door to learn my thinking as to some legal situations in the case. (Colloquy about this appears in the record, and, consistent with their denials of what so many others say, government counsel deny my law clerk's statements as to the conversation.) The case is the only trial I have ever conducted in which the courtroom deputy complained about discourtesy on the part of counsel, and I suppose that it goes without saying that it was not defense counsel who were discourteous. (An apology by government lawyers was extended later.)

Other arguments are advanced supporting the new trial motion, but I don't think that I need extend this opinion by discussing them. I have taken them into account in my thinking. Usually, when a case goes to the jury, there are no more difficulties to be encountered, but that's not so in this ill-starred case which had its first questionable conduct during the opening two minutes of grand jury investigation and which had conduct suspect under the Canons of Professional Responsibility lasting into post trial hearings. While the jury was deliberating a note was received. I notified counsel on both sides, and a hearing was held in open court with the defendant present, defense counsel present. Ms. Surbaugh of Colorado's United States Attorney's Office, and Mr. Blondin were there on behalf of the government. (Messrs. Scharf and Snyder didn't show up, although when the jury retired all counsel had been told to stand by for jury questions or a verdict). We discussed the answer which should be given to the jury, and we all agreed on it. The answer was written, and a copy was given to both sides.

I was more than a little surprised when a telephone call from Mr. Scharf was received a few minutes later. He had decided that he wasn't satisfied with that which those who saw fit to come to the hearing all agreed to. He demanded a further hearing, and I told him we would have one right away. He then made the most ridiculous demand I have ever heard in the almost 50 years since I graduated from law school. Mr. Scharf directed that I instruct the jury to "cease its deliberations" until he could have his hearing. This direction was made on the telephone and it was obviously not made in the presence of defendant or defense counsel. To accede to this absurd demand would have created irretrievable error under Rule 43 and under *Rogers v. United States*, 422 U.S. 35, 95 S.Ct. 2091, 45 L.Ed.2d 1. That error I avoided because I told Mr. Scharf I wouldn't even consider obeying his command to instruct the jury to quit deliberating. We did have the hearing and it didn't take long. Exactly what was said at that time is part of the record in the case.

After the jury verdict, timely motions were filed, and it was apparent from a reading of them that Mr. Scharf, Mr. Blondin and Mr. Snyder were going to have to

testify about matters raised in the motions. Their recognition of the factual dispute is clearly shown in the flippant brief filed in opposition to the motions. At the outset of the hearing I inquired concerning the ethical bind in which the prosecutors found themselves, and I asked if other counsel should not be handling the hearing. I admit to surprise when I was told that top lawyers in the Tax Division of the Department of Justice saw nothing wrong with the continued participation in the case of lawyers whose testimony was quite obviously going to be required. We started the hearing with participation by two of the lawyers who were essential witnesses. (One was said to be in trial somewhere else.) The hearing went for a little while, when, suddenly, there was a 180 degree change of direction, and government counsel announced that they wanted to withdraw. They were permitted to do so, and the hearing recessed. Mr. Alexander took over, and he has performed ably and ethically. However, he was handicapped by lack of time to prepare, and the hearing which I had hoped to complete weeks ago had to be continued for later testimony. We are still waiting for that testimony.

This brings us down to date. I have already explained that I cannot and I do not rule on the motion to dismiss, but I do grant the motion for a new trial. I deny the motion for judgment of acquittal, but I do so without intent that this is the "law of the case", and leave it to another judge to take a fresh look at the motion if the case is tried again.

## ORDER

Rule 6 of the Federal Rules of Criminal Procedure provides that matters occurring before a grand jury shall be secret, subject to a few exceptions. One exception is that there may be disclosure when directed by a court in connection with a judicial proceeding. I have directed that there be some disclosure of grand jury matters, and undoubtedly, typists will have to learn what is contained in grand jury transcripts in the performance of their secretarial work for lawyers who read the transcripts. Accordingly, such disclosures as may be necessary to the accomplishment of secretarial duties is authorized, but any typist who so learns of any such grand jury matters is ordered to keep secret such information. Rule 6 itself provides that violation of the secrecy requirements of the rule may be deemed contempt of court, and violation of this order may be deemed contempt of court.