PERCY L. AND LOIS V. BELL, ET AL.,[1] PETITIONERS
*v.* COMMISSIONER OF INTERNAL REVENUE,
RESPONDENT

Docket Nos. 22733-84, 25769-84,     Filed May 9, 1988.
37219-84, 37220-84.

---

[12]See note 10 *supra,* and compare *Loftus v. Commissioner,* 90 T.C. 845 (1988).

[1]Cases of the following petitioners are consolidated herewith: Glen A. Jamtgaard and Barbara Jamtgaard, docket No. 25769-84; Donald V. Osborne and Nancy E. Osborne, docket No. 37219-84; and James L. Ramsey and Patricia A. Ramsey, docket No. 37220-84. It has been stipulated that the Court's decision in disposition of these motions will be binding on the following related cases: Edward W. Blanch, Jr., and Jane R. Blanch, docket No. 25768-84; Jack G. Rentschler and Joyce E. Rentschler, docket No. 25770-84; Rudolph J. Hoffman and Shiela J. Hoffman, docket No. 25771-84; Richard C. Garbe and Margaret S. Garbe, docket No. 37218-84; John E. Lawton and Amy S. Lawton, docket No. 1294-85; and Michael T. Peak and Marian O. Peak, docket No. 10551-85.

*James L. Norris,* for the petitioners.
*Benjamin A. de Luna,* for the respondent.

OPINION

WHITAKER, *Judge:* Petitioners' motions to shift the burden of going forward with untainted evidence and motion to suppress evidence improperly attained filed herein were assigned to Special Trial Judge Francis J. Cantrel.[2] After a review of the record, we agree with and adopt his opinion which is set forth below.

OPINION OF THE SPECIAL TRIAL JUDGE

CANTREL, *Special Trial Judge:* These cases are presently before the Court on petitioners' motion to shift the burden of going forward with untainted evidence and motion to suppress evidence improperly attained filed in each case.[3] A hearing was held on petitioners' motion at Denver, Colorado, at which time a stipulation of facts was filed, some 49 exhibits were received, and oral testimony was heard. The parties have filed original simultaneous briefs and reply briefs.

FINDINGS OF FACT

Some of the facts have been stipulated and are so found. The stipulation of facts, the exhibits attached thereto, and other exhibits received are incorporated herein by this reference.

During 1979 and 1980, William A. Kilpatrick (hereinafter sometimes referred to as Kilpatrick) owned all the outstanding stock of United Financial Operations, Inc. (UFO). During

---

[2]These cases were assigned pursuant to sec. 7456 (redesignated as sec. 7443A by the Tax Reform Act of 1986, Pub. L. 99-514, sec. 1556, 100 Stat. 2755) and Rule 180. All section references are to the Internal Revenue Code of 1954 as amended, unless otherwise indicated, and all Rule references are to the Tax Court Rules of Practice and Procedure, unless indicated to the contrary.

[3]Since each motion is identical in all material respects we will hereinafter characterize them as petitioners' motion.

these years, UFO was in the business of promoting and administering tax shelters.

In 1979, UFO, Kilpatrick, Declan O'Donnell (O'Donnell), and Shiela Lerner (Lerner) promoted Alpha V Real Estate (Alpha V), Information Realty, Ltd. (Information Realty), North Sea Realty, Ltd. (North Sea), and Xanadu Realty, Ltd. (Xanadu), 4 of approximately 21 methanol limited partnerships which were to involve the development of methanol production processes and plants.[4] Petitioners were limited partners in these 4 partnerships.[5] It appears that investments in the methanol partnerships were structured to facilitate a deduction on the Federal income tax return for each partner/investor equal to four (4) times the amount of said investor's cash investment through the use of nonrecourse financing.[6]

Petitioners Percy L. and Lois V. Bell (hereinafter sometimes called petitioners Bell) filed joint Federal income tax returns with the Internal Revenue Service (IRS), for the taxable years 1979 and 1980. Thereon they claimed losses attributable to North Sea in the respective amounts of $49,511 and $37,241. On the date their timely petition was filed, they resided in Greenville, Mississippi.[7]

Petitioners Glen A. Jamtgaard and Barbara Jamtgaard (hereinafter sometimes called petitioners Jamtgaard) filed a joint Federal income tax return with the IRS for the taxable year 1979. Thereon they claimed a loss of $99,022 attributable to Information Realty. On the date their timely petition was filed they resided in Sioux Falls, South Dakota.[8]

Petitioners James L. and Patricia A. Ramsey (hereinafter sometimes called petitioners Ramsey) filed joint Federal

[4]Methanol is defined as: "a light volatile flammable poisonous liquid alcohol CH OH formed in the destructive distillation of wood or made synthetically and used esp. as a solvent, anti-freeze, or denaturant for ethyl alcohol and in the synthesis of other chemicals." Webster's Ninth New Collegiate Dictionary p. 747 (1983).

[5]Hereafter, these four partnerships will be referred to collectively as "the partnerships." Use of the words, "methanol partnerships," will refer to the 21 partnerships, which include Alpha V, Information Realty, North Sea, and Xanadu.

[6]In this connection, it further appears that the methanol partnerships offered a $50,000 tax deduction for every investment of $12,500. With over 300 known investors as of July 30, 1980, the methanol program has already produced first year deductions of over $15 million for 1979.

[7]In the absence of a stipulation of the parties to the contrary, venue on appeal of this case would lie in the U.S. Court of Appeals for the Fifth Circuit. See sec. 7482(b)(1)(A) and (2).

[8]Venue on appeal of this case, in the absence of a stipulation to the contrary, would lie in the U.S. Court of Appeals for the Eighth Circuit.

income tax returns with the IRS for the taxable years 1979 and 1980. Thereon they claimed losses attributable to Alpha V in the respective amounts of $49,500 and $36,921. On the date their timely petition was filed, they resided in Littleton, Colorado.[9]

Petitioners Donald V. Osborne and Nancy E. Osborne (hereinafter sometimes called petitioners Osborne) filed joint Federal income tax returns with the IRS for the taxable years 1979 and 1980. Thereon they claimed losses attributable to Xanadu in the respective amounts of $49,511 and $37,094. On the date their timely petition was filed, they resided in Overland Park, Kansas.[10]

Kilpatrick and O'Donnell began forming limited partnerships to invest in mineral leases in 1977 and 1978.[11] Special Agent Paul E. Raybin (Raybin) and Revenue Agent Ralph Tanner (Tanner) began a joint investigation of these mineral partnerships in November 1979.[12] Raybin first learned about the activities of Kilpatrick and O'Donnell when CID received a telephone call from an informer on August 15, 1979. Subsequently, he met with the informer on several occasions, sometimes alone and sometimes with another agent. He also spoke with the informer a number of times by telephone. His last contact with the informer was sometime in 1981. Agents other than Raybin met with the informer from time to time. As a result of the joint investigation, the informer provided Raybin and Tanner with a list of the methanol partnerships that were formed in 1979, which included Alpha V, Information Realty, North

---

[9]Venue on appeal of this case, in the absence of a stipulation to the contrary, would lie in the U.S. Court of Appeals for the 10th Circuit.

[10]Venue on appeal of this case, in the absence of a stipulation to the contrary, would lie in the U.S. Court of Appeals for the Tenth Circuit (hereinafter sometimes referred to as the Court of Appeals). Moreover, our research has disclosed that venue on appeal of the *Peak* case (see note 1 *supra*), in the absence of a stipulation to the contrary, would lie in the U.S. Court of Appeals for the 9th Circuit.

[11]These mineral leases also include coal partnerships which were to involve the mining and development of coal properties. Some 25 limited partners/investors in the coal partnerships are now before this Court in a separate proceeding. A hearing was conducted at Denver, Colorado, pertaining to four motions filed by petitioners and that matter will be the subject of a separate opinion.

[12]In a joint investigation, the Examination Division and the Criminal Investigation Division (CID) of the IRS cooperate in determining whether a taxpayer has violated any of the criminal provisions of the Internal Revenue Code. The primary duty of a revenue agent, who is part of the Examination Division, is to investigate the civil tax liability of a taxpayer, whereas, the prime responsibility of a special agent, who is part of CID, is to investigate whether any of the criminal provisions of the Internal Revenue Code have been violated by a taxpayer.

Sea, and Xanadu. Additionally, the informer provided a list of investors for some of the methanol partnerships, which list included investors in Alpha V and Information Realty. Two of the investors included in that list are James L. Ramsey, a limited partner in Alpha V, and Glen A. Jamtgaard, a limited partner in Information Realty.[13]

Prior to May 1980, the list of methanol partnerships was turned over to Revenue Agent Carol Daugherty (Daugherty). She was to coordinate the audit of the methanol partnerships and control the statute of limitations for the partners of the methanol partnerships. Her first work on the partnerships was May 19, 1980, for Alpha V; August 6, 1980, for Information Realty; November 14, 1980, for Xanadu; and January 29, 1981, for North Sea. Other than processing the tax return requests for the methanol partnerships and the related partners, getting transcripts of the partners' returns, and coordinating the statute of limitations periods with IRS District Director's Offices outside of the Denver, Colorado District (hereinafter called Denver District Office), no other action was taken by her. The identities of the partners in the methanol partnerships were obtained from the list of investors provided by the informer and from information on the Form K-1 attached to each of the methanol partnership returns.[14]

On May 12, 1980, the Chief, CID, of the Denver District Office requested, by memorandum addressed to the Regional Commissioner, Southwest Region, a grand jury investigation of Kilpatrick, O'Donnell, and Lerner in accordance with section 9267.2 of the Internal Revenue Manual (hereinafter referred to as IRM).[15] The requested investigation would include, among other subjects, activities involving promotions of the methanol partnerships by UFO, Kilpatrick, O'Donnell, and Lerner.

---

[13]Additional investors included in that list are E.W. Blanch, Jr., R.J. Hoffman, Jr., Richard C. Garbe, Jr., and A.S. Lawton & Co., all limited partners in Information Realty. See note 1 supra.

[14]Copies of the partnership returns are a part of the record except that for Information Realty for the taxable year 1979. That return has been misplaced by the Internal Revenue Service Center. While diligent efforts have been made to locate that return they have been fruitless. Although Forms K-1 (Partner's Share of Income, Credits, Deductions, etc.) are attached to the original of each partnership return, copies thereof are not included in this record as the parties have stipulated that they are unnecessary for these proceedings.

[15]Sec. 9267.2 of the IRM provides for Requests for Grand Jury Investigations.

On July 30, 1980, the Office of Chief Counsel for the IRS pursuant to section 6103(h)(3)(A) forwarded a letter to the Assistant Attorney General, Tax Division, Department of Justice (hereinafter called Department of Justice) recommending that a grand jury investigation be conducted of Kilpatrick and others to gather additional evidence pertaining to the promotion of the methanol partnerships.[16] The IRS made its recommendation because of its belief that it would have difficulty developing a case through its normal criminal administrative process. It was further concerned that Kilpatrick, his related entities, and others would be uncooperative and would frustrate any attempt by the IRS to gain access to records by criminal administrative means. It further believed that it would be faced with time consuming challenges to any administrative summonses it issued. This belief was supported by the problems encountered by the Securities and Exchange Commission (SEC), in an unrelated matter regarding some of the entities involved with the methanol partnerships, when it issued administrative subpoenas to Kilpatrick, O'Donnell, and related corporations in August and September 1978. All parties refused to comply with the subpoenas. Numerous hearings were held, and in January 1979, a Federal District Court ordered the parties to comply with the subpoenas. This decision was appealed to the Court of Appeals, and, as of May 12, 1980, the SEC had received no records.

In making its recommendation, the IRS noted that its investigation to date had disclosed the names and addresses of some 360 methanol shelter investors. The IRS also advised, in transmitting some 55 exhibits to the Department of Justice, that its file contained a good deal of information developed outside of any grand jury.

The Department of Justice approved the IRS' recommendation on December 18, 1980, on which date it requested the U.S. Attorney's Office at Denver, Colorado, to institute a grand jury investigation.

---

[16]Sec. 6103(h), pertaining to "Disclosure to Certain Federal Officers and Employees for Purposes of Tax Administration, Etc." provides in relevant part—

(3) FORM OF REQUEST.—In any case in which the Secretary is authorized to disclose a return or return information to the Department of Justice pursuant to the provisions of this subsection—

(A) if the Secretary has referred the case to the Department of Justice * * * the Secretary may make such disclosure on his own motion * * *

Soon after December 18, 1980, the Department of Justice assigned attorney Steven L. Snyder (Snyder) to conduct the grand jury investigation of Kilpatrick and others. In late December 1980, Raybin and Special Agent Richard Mendrop (Mendrop) were assigned to assist Snyder in that investigation. Immediately after their assignments, Raybin and Mendrop received specific instructions from Snyder regarding their duty to safeguard all matters occurring before the grand jury from being disclosed to unauthorized third parties.[17] Additionally, their names were placed on a disclosure list as provided by rule 6(e).[18] In September 1981, the Department of Justice assigned attorney Thomas Blondin (Blondin) to assist Snyder in the grand jury investigation. Snyder and Blondin were responsible for conducting that investigation.

In January 1981, a grand jury convened in Denver, Colorado, to investigate, among others, activities involving the promotion of the methanol partnerships by UFO, Kilpatrick, O'Donnell, and Lerner.

At varying times throughout the grand jury investigation of Kilpatrick, et al., the Department of Justice attorneys directing the investigation requested and received assis-

---

[17]Rule 6 of the Federal Rules of Criminal Procedure (hereinafter sometimes referred to as "rule 6(e)") pertains to the grand jury and subpart (e) thereof relates to recording and disclosure of proceedings. Our recitation of relevant language from specific parts of rule 6 throughout this opinion will set forth the language in effect for purposes of this proceeding. Thus, rule 6(e) states in pertinent part:

(e) * * *

(2) General Rule of Secrecy. * * * [A]n attorney for the government, or any person to whom disclosure is made under paragraph (e)(3)(A)(ii) of this subdivision shall not disclose matters occurring before the grand jury, except as otherwise provided for in these rules. * * *

(3) Exceptions.

(A) Disclosure otherwise prohibited by this rule of matters occurring before the grand jury * * * may be made to—

(i) an attorney for the government for use in the performance of such attorney's duty; and

(ii) such government personnel * * * as are deemed necessary by an attorney for the government to assist an attorney for the government in the performance of such attorney's duty to enforce federal criminal law.

(B) Any person to whom matters are disclosed under subparagraph (A)(ii) of this paragraph shall not utilize that grand jury material for any purpose other than assisting the attorney for the government in the performance of such attorney's duty to enforce federal criminal law. * * *

[18]Rule 6(e)(3)(B) states:

(B) * * * An attorney for the government shall promptly provide the district court, before which was impaneled the grand jury whose material has been so disclosed, with the names of the persons to whom such disclosure has been made, and shall certify that he has advised such persons of their obligation to secrecy under this rule.

tance from numerous IRS personnel. At no time did Raybin, Mendrop, or the other IRS personnel whose assistance was requested by Snyder and/or Blondin disclose matters occurring before the grand jury, nor were matters occurring before the grand jury disclosed to them for civil audit purposes.

By memorandum dated January 16, 1981, the Chief, CID, Denver District Office, notified the Chief of its Examination Division (hereinafter referred to as the Examination Division), pursuant to section 9267.4(1) of the IRM that the examination division must suspend all examinations of taxpayers and relevant tax periods which are under grand jury investigation.[19] In addition, all original tax returns and administrative files for periods under investigation by the grand jury which were in the possession of the examination division were to be transferred to CID. To accomplish these objectives, the examination division was to contact Raybin or Mendrop, who had been assigned to assist in the grand jury investigation. The examination division was to remain responsible for the civil statute of limitations relative to periods under investigation by the grand jury. The examination division interpreted the memorandum as stating that all civil audits of the methanol partnerships should be suspended until further notification.

In March 1981, the methanol partnerships' audits were reassigned from Daugherty to Revenue Agent Co-op Gloria Fuentez (Fuentez), a college student working part-time for the IRS. Fuentez was not required to audit the methanol partnerships' returns. She was to see that all statute of limitations controls were in place, that all tax returns were requested, that all out-of-State District Directors were notified that the Denver District Office was the control district for the methanol partnership audits, and to coordinate any audits of the individual partners with the Denver District Office.

---

[19] Sec. 9267.4(1), IRM, dealing with responsibility for Control of Returns and Solicitation of Civil Consents provides:

"Once a grand jury request has been approved by Service and Department of Justice officials, the District Director will notify the Chief, Examination Division * * * that the taxpayer is under grand jury investigation and that civil action must either be suspended or not initiated on the subject taxpayer for the type of tax involved and all subsequent periods except as otherwise hereinafter provided."

In August 1981, Revenue Agent Stacy Williams (Williams), a computer audit specialist (i.e., a revenue agent with computer training) was assigned to assist in the grand jury investigation of Kilpatrick, et al. Upon commencement of his assignment, he was notified of the secrecy requirements respecting matters occurring before the grand jury and that he was not to disclose such matters in any form or fashion to other revenue agents. His primary duties consisted of computerizing and automating the records and information accumulated by the attorneys responsible for conducting the grand jury investigation. From September 1981 until March 1982, Williams, with assistance from other IRS personnel assigned to assist in the grand jury investigation, caused information contained in records obtained for possible presentment to the grand jury to be placed in computers and automated.[20] This was accomplished by first identifying the specific information needed to be placed on a computer coding sheet. Then predefined fields were determined. Thereafter, IRS personnel who were assisting in this process, would take the original records and extract information therefrom to be placed in the appropriate predefined field(s) on the coding sheets. The information placed on the coding sheets was not decipherable unless one knew what type of information the specific predefined field(s) represented. The information placed on the computer coding sheets was then keypunched onto computer cards. At Williams' direction, and with approval of the Department of Justice attorneys responsible for conducting the grand jury investigation, these computer cards were transferred to three locations where they were placed in a mechanical reader which caused the information on the computer cards to be placed into a computer.[21]

At no time did Williams disclose matters occurring before the grand jury, nor were matters occurring before the grand jury disclosed to him for civil audit purposes. Further, there is no evidence in this record that anyone connected in any

---

[20]This technique was utilized primarily for the purpose of maintaining an accurate inventory of those records, particularly financial records, in the event it was decided to present them to the grand jury.

[21]Computer facilities at the following locations were utilized by Williams: (1) Ogden, Utah, Internal Revenue Service Center; (2) Air Force Accounting and Financial Center, Lowry Air Force Base, Denver, Colorado; and (3) the Dallas, Texas District Office of the IRS.

manner with any of the computer facilities or who assisted in the computerization/automation process disclosed matters occurring before the grand jury, nor were matters occurring before the grand jury disclosed to them for civil audit purposes.

The original partnership returns of Xanadu, North Sea, and Alpha V for 1979 and 1980 were obtained by the Examination Division from the Internal Revenue Service Centers beginning in May 1980 and ending in June 1981. Sometime in 1981, these returns were provided to CID by the examination division.

In July or August 1982, the audits of the methanol partnerships, which included the partnerships, were reassigned to Revenue Agent Richard Gullion (Gullion). At that time, he was advised by his group manager, Greg Lendorf (Lendorf) that the methanol partnerships were related to an ongoing grand jury investigation and that, because of the ongoing grand jury investigation, the examination division would not conduct any civil audits. When Gullion actually received the files for the methanol partnerships, in late October or early November of 1982, he familiarized himself with the names of the various methanol partnerships, the deductions which were claimed, and the number of partners involved. His immediate task, however, was to gain control of some *620* investors who resided in some *41* IRS districts. The files contained the January 16, 1981, memorandum, notifying the examination division to suspend the audits of the methanol partnerships. It was Gullion's understanding at the time he received these assignments that the methanol partnerships were assigned to him for civil audit examination when such an examination could be conducted.[22]

A 27-count indictment, Criminal No. 82-CR-222, was returned by the grand jury against Kilpatrick, O'Donnell, Lerner, the Bank of Nova Scotia, and others. The indictment was filed on September 30, 1982 in the U.S. District Court for the District of Colorado (District Court).[23] The indictment charged all defendants with conspiracy, several

---

[22]In a civil examination of a partnership, an agent must contact the IRS Service Centers and District Offices where the investors reside in order to secure the Federal income tax returns of the investors for placement in his inventory.

[23]Rule 6(f) respecting Finding and Return of Indictment states—"The indictment shall be returned by the grand jury to a federal magistrate *in open court.*" (Emphasis supplied.)

defendants with mail fraud and/or tax fraud, and Kilpatrick with obstruction of justice. None of the petitioners was indicted.

In early October 1982, Gullion learned that the grand jury had returned an indictment in the Kilpatrick, et al. investigation. He was informed of this development by Lendorf, who showed Gullion a newspaper article reporting the indictment. Thereafter, he contacted Mendrop for the purpose of obtaining a copy thereof. Mendrop provided Gullion with a copy of the indictment in October 1982, at which time Gullion studied that part of the indictment which related to the methanol partnerships.

From July or August 1982 through December 1982, Gullion followed CID's instructions by keeping the audits of the methanol partnerships in suspense. During this period, he controlled the methanol partnerships' returns for the purpose of protecting the statute of limitations.

On December 1, 1982, the Chief, CID, by memorandum, informed the Chief, Examination Division, that CID had been advised by the Department of Justice attorneys assigned to the grand jury investigation, that the examination division could proceed with all necessary civil actions on all investors and general partners involved in the methanol partnerships except for Kilpatrick, O'Donnell, and Lerner. No civil action was to be taken regarding Kilpatrick, O'Donnell, Lerner, or any other named defendant without approval from the Department of Justice. Any position taken by the IRS was to be consistent with the Government's position as set forth in the indictment. Any question relating to the positions of the Department of Justice or requests for additional information were to be directed to Mendrop or Raybin.

After receiving a copy of this memorandum in December 1982, Gullion continued in his efforts to get the returns for the methanol partnerships' investors under control. On January 12, 1983 Gullion forwarded notification letters to the partnerships advising that its 1979 and 1980 tax returns had been assigned to him for audit. The letters stated in part:

A report will be issued in the near future containing a position consistent with facts as presented in the Federal Grand Jury indictment

of September 30, 1982 for the United States District Court for the District of Colorado.

If you, as the general partner, have questions concerning the partnership examination(s), please call me at the number shown above. Please instruct your limited partners that, for purposes of convenience, I will only discuss the partnership examination(s) at the general partner level and that limited partners should not contact me by phone. All partners will receive letters containing instructions pertaining to their claimed partnership losses, including an offer at the examination level for settlement based on out-of-pocket (cash) investment contribution in the initial year.

Due to the imminent expiration of the statute of limitations respecting the limited partners' returns for the taxable year 1979, and due to the anticipated lack of cooperation by the general partners of the partnerships, Gullion decided to disallow all the deductions claimed on the returns of the partnerships based on the information contained in the indictment. A report dated January 31, 1983, based on information set forth in the indictment, was prepared by Gullion for each of the partnerships. At the time Gullion prepared the reports, at least the following information had been made available to the IRS: (a) Information pertaining to the methanol partnerships, which included the four before the Court, and information concerning the list of investors, which included petitioners Jamtgaard and petitioners Ramsey, which had been derived from the lists that were obtained by Raybin and Tanner in the course of their joint investigation; (b) information originating from the returns of three of the partnerships and accompanying Schedules K-1, which contained the names of limited partners/investors (these returns were received by the examination division between May 1980 and June 1981); and (c) a copy of the indictment returned by the grand jury, which was filed in the District Court on September 30, 1982.

When Gullion prepared the reports, he knew the indictment had been returned by the grand jury which investigated Kilpatrick, et al., and, as he understood it, an indictment is a public record and its use did not constitute the unauthorized use of grand jury information.[24] He also

---

[24]Sec. 4567.5, IRM, states: "Once grand jury information has been introduced into the public record, the information is no longer covered by grand jury secrecy and can be used in an investigation. Examples of public record are: trial transcripts, *indictments*, pleadings and sentencing procedures." (Emphasis added.)

knew that any position taken by the IRS was to be consistent with the Government's position as set forth in the indictment.

Gullion's reports were prepared to facilitate preparation of notice of deficiency language for those limited partners/investors who would not execute consents to extend the statute of limitations for assessment and collection of income tax for 1979. At the time he prepared his reports, he had not obtained nor examined the books and records of the partnerships because he assumed the books and records were not in the possession of the general partners. This assumption was made prior to the time the notification letters were sent to the general partners on January 12, 1983. Subsequent to January 12, 1983, Gullion was contacted by a general partner of one of the methanol partnerships assigned to him, who informed him that all of his partnership's records had been previously subpoenaed by the grand jury.[25] While this person advised that he had copies of some of his partnership's records, Gullion did not request to see them nor did he seek to obtain records from any of the other methanol partnerships. He did not issue summonses to any of the methanol partnerships seeking books and records from the time of his assignment until the cases were transferred from him.

With the assistance of the Quality Review Section of the Denver District Office, Gullion prepared language to be used in notices of deficiency to be issued, if necessary, to the limited partners (investors). A memorandum containing this language was transmitted to the District Counsel's Office, Denver, Colorado, for approval. By memorandum dated February 14, 1983, said District Counsel's Office, in approving language to be used in the notice of deficiency, advised that said language was based solely on the criminal indictment returned in Kilpatrick, et al., and that a notice of deficiency should be issued as a protective measure only for those limited partners/investors who reject an offer to settle for out-of-pocket (cash) investment and who refuse to consent to extend the statute of limitations.[26]

---

[25]The identity of this individual and of which limited partnership he is the general partner is not revealed in the record.

[26]The partnership cases were determined to be settlement vehicles by the Examination Division.

According to the examination division's procedures in the partnerships' audits, the revenue agent assigned the partnerships' returns would forward Gullion's report to the various IRS districts where the investors resided. That report was accompanied by instructions that a statutory notice of deficiency disallowing the flowthrough loss deduction would only be issued to protect the statute of limitations after the investor refused to extend the statute of limitations for assessment and collection of taxes attributable to the claimed partnership loss from his or her partnership and there was no out-of-pocket settlement. This procedure was followed in the four cases now before the Court. Consistent with this procedure, Gullion prepared an information package to be sent to the various districts where the partners/investors resided, for the purpose of notifying these districts of the status of the examinations of the partnerships. These packages included: (1) A copy of Gullion's report, (2) the approved notice of deficiency language, (3) a listing of the partners/investors who resided in each respective district together with an identification of each partnership in which they were investors, and (4) instructions for the issuance of a notice of deficiency.

After the information packages were sent out, Gullion then worked on gaining control of the taxable year 1980. In February 1984, Gullion received assistance in his examination of the methanol partnerships when all but two of them were reassigned to other revenue agents.[27] His retention of two of the methanol partnerships' files was based on his desire to help coordinate the working of all the examinations of the methanol partnerships and thus expedite their completion. During his examination of these two files, he concentrated on potential problem areas which he anticipated would be present in the examination of all the methanol partnerships.

One area of concern was the presence of a named defendant during the revenue agent's initial interview with a partner/investor. As found earlier, the December 1, 1982, memorandum from the Chief, CID instructed the Examination Division to proceed with all civil audits on all investors and general partners involved in the methanol partnerships

---

[27]The specific reassignments are set forth hereinafter. See page 896 *infra.*

*except* for any defendant named in the indictment. This problem was of particular concern to Gullion at the time Revenue Agent Rick Hector (Hector) was assigned to the audit of Information Realty in February 1984.

Subsequent to the reassignment of the audit of Information Realty, Gullion met with Hector to provide him with background information about Information Realty and discuss the overall status of the partnership. During the course of this transitional meeting, Gullion instructed Hector to withhold auditing the partnership until he received some guidance on how to proceed if a named defendant was present during a revenue agent's initial interview with a partner/investor. He informed Hector that he had contacted Mendrop for assistance, who in turn contacted the Department of Justice attorneys conducting the grand jury investigation. Shortly thereafter, Mendrop informed Gullion to proceed with the civil examination as normal, and Gullion then transmitted this information to Hector.

Neither Gullion nor Hector at any time disclosed matters occurring before the grand jury, nor were matters occurring before the grand jury disclosed to them for civil audit purposes.

The Examination Division of the various District Director's Offices requested petitioners to extend the statute of limitations for 1979 and 1980.[28] On January 27, 1983, a letter was sent to petitioners Bell for the taxable year 1979 which advised in pertinent part:

> Enclosed is a copy of consent Form 872-A for your records.[29]
>
> You may decide, at some future date, that you want to terminate the consent to keep the statutory period for assessment open. If you do decide to terminate the agreement, you will need Form 872-T, Notice of Termination of Special Consent to Extend the Time to Assess Tax, for this purpose.
>
> The Internal Revenue Service office that has your return(s) under consideration will send you partially completed Forms 872-T upon request. You should sign and return Form 872-T in accordance with instructions on the form. You can terminate consent Form 872-A only by using Form 872-T, and in no other way.

---

[28]See note 31 *infra.* Generally, in the absence of a consent duly executed by the parties, the 3-year period for assessment and collection of tax for the taxable year 1979 would expire on Apr. 15, 1983. See sec. 6501(a).

[29]Form 872-A is a Special Consent to Extend the Time to Assess Tax.

If you terminate this agreement, the Service may mail you a notice of deficiency.

Similar letters were sent to petitioners Bell for the taxable year 1980 and to petitioners Ramsey and Osborne for the taxable years 1979 and 1980. Such a letter was sent to petitioners Jamtgaard for the taxable year 1979, which was the only year they had at issue.

Prior to the expiration of the time prescribed by section 6501(a) for the assessment of income tax due for the taxable year 1979, petitioners timely executed agreements pursuant to the provisions of section 6501(c)(4) extending the period for assessment of the tax due for the taxable year 1979.

Prior to the expiration of the time prescribed by section 6501(a) for the assessment of income tax due for the taxable year 1980, petitioners Osborne timely executed an agreement pursuant to the provisions of section 6501(c)(4) extending the period for assessment of the tax due for 1980.

On advice of their duly authorized representative, petitioners Jamtgaard (for taxable year 1979), petitioners Ramsey (for taxable year 1979), and petitioners Osborne (for taxable years 1979 and 1980) each signed a Form 872-T and submitted same to the Examination Division.[30]

Petitioners-Bell did not sign an agreement to extend the statute of limitations for assessment of taxes for 1980 after receiving an offer to do so on three occasions. Petitioners-Ramsey did not sign an agreement to extend the statute of limitations for assessment of taxes for 1980 after receiving an offer to do so.

Based on petitioners' actions described above, respondent timely issued statutory notices of deficiency to petitioners disallowing their claimed partnership losses.[31] The notices were based on Gullion's reports and on language approved by District Counsel's Office, which were based solely on the indictment.[32]

---

[30]As noted earlier, Form 872-T is a "Notice of Termination of Special Consent to Extend the Time to Assess Tax."

[31]A notice of deficiency was issued to petitioners Bell on Apr. 5, 1984, by the Office of the District Director, Jackson, Mississippi; to petitioners Jamtgaard on June 26, 1984, by the Office of the District Director, Aberdeen, South Dakota; to petitioners Ramsey on Oct. 4, 1984 by the Office of the District Director, Denver, Colorado; and to petitioners Osborne on Oct. 5, 1984, by the Office of the District Director, Wichita, Kansas.

[32]See pars. 29 and 38 of the stipulation of facts and Exhibit 34-AH.

In February 1983, after a hearing on various motions to dismiss the indictment filed by defendants in the District Court, the Court (Judge Kane) dismissed 26 of the 27 counts of the indictment due to failure to state a criminal offense and as improperly pleaded.[33] Still remaining was count XXVII, which charged Kilpatrick with obstruction of justice. In March 1983, a notice of appeal was filed by the United States from the District Court's Order of February 23, 1983, which dismissed counts I through XXVI of the indictment.

In May of 1983, Gullion attended the obstruction of justice jury trial of Kilpatrick. He was notified of the trial by Mendrop. Gullion attended this trial, which was presided over by Judge Winner, because it would be his first opportunity to learn of the information obtained by the Department of Justice in its grand jury investigation of Kilpatrick, et al. Gullion intended to utilize any relevant information presented at the trial or entered into the public record in any other public hearing in his examination of the methanol partnerships. On May 9, 1983, Kilpatrick was convicted by the jury of obstruction of justice.

On August 9, 1983, the Court of Appeals, upon request made after briefing but before oral argument, partially remanded the dismissal of the 26 counts of the indictment to the District Court to determine whether misconduct on the part of Government attorneys in connection with the grand jury investigation and presentation constituted additional grounds for dismissal.

On August 25, 1983, following the partial remand but before later hearings before another judge (Judge Kane) relating specifically to the matters partially remanded by the Court of Appeals, the District Court (Judge Winner) issued an opinion which, among other things, summarized the status of the cases (which were being reassigned to Judge Kane), granted Kilpatrick's motion for a new trial on the obstruction of justice count, and ordered disclosure of the grand jury transcript to the defendants.[34] The United

---

[33]Included in our record is a 15-page excerpt of proceedings (Court's ruling) respecting the District Court hearing on this matter on Feb. 21, 1983. See Exhibit 35-AI.

[34]*United States v. Kilpatrick,* 575 F. Supp. 325 (D. Colo. 1983) (Winner, J.). This opinion followed a hearing on motions filed by Kilpatrick for a new trial and to dismiss count XXVII

States appealed the Court's order granting a new trial to Kilpatrick.[35] Nowhere in its opinion or in the District Court transcripts which are before this Court, did the District Court find as a fact that matters occurring before the grand jury were disclosed for civil audit purposes.[36]

Later, after 10 days of hearings, which were spread over a period of months, involving the matters which had been partially remanded by the Court of Appeals, the District Court dismissed all 27 counts of the indictment because of prosecutorial misconduct.[37] The United States appealed these dismissals.[38] On June 18, 1987, the Court of Appeals reversed the District Court and ordered reinstatement of *all* counts of the indictment.[39] The Court of Appeals found *no* support in the voluminous record before it for the District Court's finding that IRS agents manipulated the grand jury

---

of the indictment on the ground of prosecutorial misconduct. Appearing as witnesses at this hearing were Gullion, Raybin, and Mendrop.

[35]See Exhibit 45-AS, which contains volumes 5 through 11 of the record on appeal to the Court of Appeals and which embraces transcripts of testimony (pp. 1 through 1317) received by the District Court in regard to the hearing on Kilpatrick's motion for a new trial on count XXVII and motion to dismiss count XXVII on grounds of prosecutorial misconduct. A portion of the record on appeal is sealed and, therefore, Exhibit 45-AS, is only a portion of that record. In addition, except for Exhibits 10 and 11-K, which are part of this Court's record, the exhibits referred to in the aforesaid transcripts are not part of the record in this proceeding.

[36]The District Court, after the obstruction of justice trial and after the hearing on Kilpatrick's motions to dismiss and for a new trial, makes it abundantly clear in its opinion, which was issued on Aug. 25, 1983, that the record before it was incomplete, that proof was needed for the charges of repeated misconduct and, therefore, further hearings were necessary to prove the charges of misconduct. *United States v. Kilpatrick,* 575 F. Supp. at 340.

[37]*United States v. Kilpatrick,* 594 F. Supp. 1324 (D. Colo. 1984). At footnote 1 of the court's opinion it is recited: "The facts relied upon in this opinion are taken from voluminous transcripts of hearings before two grand juries, Judge Winner, and me [Judge Kane] and a trial before a jury." There, the District Court did find as a fact that IRS agents manipulated the grand jury to obtain materials to be used for civil litigation. Raybin, Mendrop, and IRS Special Agent Gerard Burke appeared as witnesses during these hearings.

[38]See Exhibit 44-AR, which contains volumes XIV through XXIV of the record on appeal to the Court of Appeals and which embraces transcripts of testimony (pp. 1 through 24; 1 through 1251) received by the District Court during its hearings on the matter partially remanded by the Court of Appeals. A portion of the record on appeal is sealed and, consequently, Exhibit 44-AR is only a portion of that record. Further, except for Exhibits 10 and 11-K, which are part of the record herein, the exhibits referred to in the beforementioned transcripts are not part of the record in this proceeding.

[39]*United States v. Kilpatrick,* 821 F.2d 1456 (10th Cir. 1987), rehearing denied Aug. 19, 1987. Timely petitions for a writ of certiorari were filed with the U.S. Supreme Court by the Bank of Nova Scotia and by Kilpatrick, O'Donnell, and Lerner on Oct. 9, 1987, and Oct. 13, 1987, respectively. See note 45 *infra.* In its reversal, the Court of Appeals considered and decided the appeals insofar as they embraced misconduct on the part of Government attorneys, failure to state a criminal offense, and improper pleading. The court advised that a separate opinion addressing the appeal of the granting of Kilpatrick's motion for a new trial was to follow. See *Blondin v. Winner,* 822 F.2d 969 (10th Cir. 1987), cert. denied 484 U.S.___ (1988), where the Government's appeal was dismissed.

to obtain materials to be used for civil litigation.[40] None of the petitioners in these four cases, nor any of the petitioners listed in note 1 *supra* is a party in the criminal litigation with the United States.

Any relevant information that was presented in open court during the obstruction of justice trial or the three hearings, all of which were conducted in the District Court, would have been available to the IRS as a matter of public record for civil audit purposes.[41]

On February 8, 1984, the partnership file of Alpha V was transferred from Gullion to Revenue Agent Robert Cofone (Cofone), who is presently the assigned agent to the audit of that partnership.

On February 8, 1984, the partnership files of North Sea and Xanadu were transferred from Gullion to Revenue Agent Sam Simmons (Simmons), who is presently the assigned agent to the audits of those partnerships.

On February 13, 1984, the partnership file of Information Realty for 1979 was transferred from Gullion to Revenue Agent Mary Wright (Wright). On February 16, 1984, the file was transferred from Wright to Hector, who attempted to acquire its books and records. He was advised by its general partner, Robert Caddell, that he had never seen any partnership records and if there were any that they would be in the control of UFO. On January 28, 1985, the file was transferred from Hector to Cofone, who is presently assigned to the audit of that partnership.

The audit file pertaining to the taxable years 1979 and 1980 of petitioners Bell was in the possession and control of the following additional IRS personnel, for varying periods of time, from the beginning of the audit until sometime in August 1984:

(a) Revenue Agent James M. Rodgers;
(b) Revenue Agent Janice Spence;
(c) Sanford Warren, Chief, Quality Review; and

---

[40]See *United States v. Kilpatrick,* 594 F. Supp. at 1345, and 821 F.2d at 1470-1471. The Court of Appeals issued its opinion after its review and consideration of the District Court opinions, the records of the hearings, and the grand jury proceedings. 821 F.2d at 1470.

[41]In this connection, we note that the date of the last hearing before Judge Kane on the matter partially remanded by the Court of Appeals was Feb. 8, 1984, whereas the date of the earliest notice of deficiency involved in this proceeding (including those petitioners listed in note 1 *supra*) is Apr. 5, 1984.

(d) Nancy Richardson, Form 872-A clerk.

In August 1984, petitioners Bell's file was transferred to District Counsel's Office in Birmingham, Alabama, for purposes of answering the petition. In February 1985, the file was transferred to District Counsel's Office in Denver, Colorado, the designated place of trial.

The audit file pertaining to the taxable years 1979 and 1980 of petitioners Osborne was in the possession and control of the following additional IRS personnel, for varying periods of time, from the beginning of the audit until sometime in December 1984:

(a) Tax Auditor B. Phillips;

(b) Revenue Agent James Gaume; and

(c) B.R. Williamson, 90-day clerk.

In December 1984, petitioners Osborne's file was transferred to District Counsel's Office in Kansas City, Missouri, for purposes of answering the petition. Later in the same month, the file was transferred to District Counsel's Office in Denver, Colorado, the designated place of trial.

The audit file pertaining to the taxable year 1979 of petitioners Jamtgaard was in the possession and control of the following additional IRS personnel, for varying periods of time, from the beginning of the audit until sometime in August 1984:

(a) Revenue Agent John Van Sloten; and

(b) R. Graf, 90-day clerk.

In August 1984, petitioners Jamtgaard's file was transferred to District Counsel's Office in St. Paul, Minnesota, for purposes of answering the petition. In December 1984, the file was transferred to District Counsel's Office in Denver, Colorado, the designated place of trial.

The audit file pertaining to the taxable years 1979 and 1980 of petitioners Ramsey was in the possession and control of the following additional IRS personnel, for varying periods of time, from the beginning of the audit until sometime in December 1984:

(a) Revenue Agent Sharon Christianson; and

(b) Mary Sponenberg, 90-day clerk.

In December 1984, petitioners Ramsey's file was transferred to District Counsel's Office in Denver, Colorado, for

purposes of answering the petition. The file is presently in the possession and control of that office.

The following IRS personnel did not disclose matters occurring before the grand jury nor were matters occurring before the grand jury disclosed to them for civil audit purposes (including the preparation of the notices of deficiency involved herein):

   (a) Tanner;
   (b) Daugherty;
   (c) Fuentez;
   (d) Cofone;
   (e) Simmons;
   (f) Revenue Agent James M. Rodgers;
   (g) Revenue Agent Janice Spence;
   (h) Sanford Warren, Chief, Quality Review;
   (i) Tax Auditor B. Phillips;
   (j) Revenue Agent James Gaume;
   (k) B.R. Williamson, 90-day clerk;
   (l) Revenue Agent John Van Sloten;
   (m) R. Graf, 90-day clerk;
   (n) Revenue Agent Sharon Christianson;
   (o) Mary Sponenberg, 90-day clerk;
   (p) Nancy Richardson, Form 872-A clerk; and
   (q) Wright.

Personnel of the District Counsel's Offices in Birmingham, Alabama; Kansas City, Missouri; St. Paul, Minnesota; and Denver, Colorado, at no time disclosed matters occurring before the grand jury nor were matters occurring before the grand jury disclosed to them for civil audit purposes.

No petition for disclosure pursuant to rule 6(e)(3)(C)(i),[42] seeking disclosure of matters occurring before the grand jury,[43] was ever filed with the District Court on behalf of the IRS or petitioners.

---

[42]Rule 6(e)(3)(C)(i) provides:

(C) Disclosure otherwise prohibited by this rule of matters occurring before the grand jury may also be made—

(i) when so directed by a court preliminarily to or in connection with a judicial proceeding;

[43]Rule 6(e)(3)(D) reads, in pertinent part—

(D) A petition for disclosure pursuant to subdivision (e)(3)(C)(i) shall be filed in the district where the grand jury convened.

## ULTIMATE FINDINGS OF FACT

On July 30, 1980, when the IRS recommended that a grand jury investigation be conducted of Kilpatrick and others, it advised the Department of Justice that its file then contained a good deal of information developed "outside of any grand jury."[44]

Prior to the time Gullion prepared his reports, i.e., January 31, 1983, at least the following information had been made available to the IRS:

(a) Information received from an informant.

(b) Information pertaining to the methanol partnerships, which included the four before the Court, and information respecting the list of investors, which included petitioners Jamtgaard and petitioners Ramsey, which had been derived from the lists that were obtained by Raybin and Tanner in the course of their joint investigation.

(c) Information originating from the returns of three of the partnerships and accompanying Schedules K-1, which contained the names of limited partners/investors.

(d) A copy of the indictment returned by the grand jury, which was filed in the District Court on September 30, 1982.

At the time the statutory notices of deficiency were prepared by the respective District Director's Offices, at least the following information was available to those offices:

(a) The reports prepared by Gullion for the partnerships before the Court.

(b) A listing of the partners/investors who resided in each respective district together with an identification of each partnership they were investors in.

(c) Instructions for the issuance of a notice of deficiency.

The Court of Appeals found *no* support in the voluminous record before it for the District Court's finding that IRS agents manipulated the grand jury to obtain materials to be used for civil litigation.

No personnel of the IRS disclosed matters occurring before the grand jury nor were matters occurring before the

---

[44]As found earlier, the IRS, in making its recommendation, transmitted therewith some 55 exhibits, all of which were obtained independent of the grand jury's investigation.

grand jury disclosed to them for civil audit purposes, including the preparation of the notices of deficiency herein involved.

No personnel of the Department of Justice or the U.S. Attorney's Office, Denver, Colorado, disclosed matters occurring before the grand jury nor were matters occurring before the grand jury disclosed to them for civil audit purposes.

No other person involved in the grand jury investigation of Kilpatrick, et al., disclosed matters occurring before the grand jury nor were matters occurring before the grand jury disclosed to them for civil audit purposes.

None of the petitioners in these four cases nor any of the petitioners listed in note 1 *supra* is a party to *United States v. Kilpatrick, et al.,* Criminal No. 82-CR-222.

No petition for disclosure pursuant to rule 6(e) was ever filed with the District Court on behalf of the IRS or petitioners seeking disclosure of matters occurring before the grand jury.

The unsealed indictment filed in the District Court on September 30, 1982, is a public record, and the receipt of a copy thereof and its use as a basis for the issuance of the notices of deficiency herein involved was reasonable and proper.

## OPINION

In our view, and the parties are in agreement, the critical issue we must decide herein is whether *matters occurring before the grand jury,* in violation of rule 6(e), were received and used by respondent for civil audit purposes, including the preparation of the notices of deficiency involved herein.[45]

Petitioners, by and through their motion, exhort this Court to shift the burden of going forward with untainted

---

[45]We note, in the interest of fairness, that the opinion of the Court of Appeals was not available to counsel for the parties until some time after the reply briefs were filed in this proceeding. Moreover, the U.S. Supreme Court on Jan. 11, 1988, granted, in part, the petitions for a writ of certiorari filed by Kilpatrick, O'Donnell, Lerner, and the Bank of Nova Scotia. *The Bank of Nova Scotia v. United States* (docket No. 87-578), *Kilpatrick v. United States* (docket No. 87-602), 487 U.S. ___ (1988). However, the Supreme Court, which has consolidated the cases, has limited its review to the question of whether the District Court is authorized to dismiss an indictment before trial under its inherent supervisory power, without a finding of prejudice to the defendants, to protect the integrity of the grand jury process.

evidence to respondent and to suppress evidence improperly attained. As grounds therefor, they assert:

(1) Respondent is estopped by the doctrines of comity, res judicata, estoppel by judgment and collateral estoppel to contest that his revenue agents had access to and used for civil audit purposes matters occurring before the grand jury without an order from the District Court under rule 6(e)[46] and, thus, there were secrecy violations, improper disclosure and use of matters occurring before the grand jury in connection with the grand jury investigation of Kilpatrick, et al.[47]

(2) Respondent has at no time conducted a civil audit examination of the methanol partnerships or the partnerships.

(3) Respondent's notices of deficiency are based on matters occurring before the grand jury and, hence, the receipt and use of such matters for such purposes was improper and a violation of law since respondent did not seek or receive an order from the District Court pursuant to rule 6(e).

Petitioners' arguments on brief in support of the grounds raised in their motion are:

(1) Respondent is collaterally estopped from denying that the grand jury investigation of Kilpatrick, O'Donnell, Lerner, and others illegally included IRS agents as grand jury agents, illegally disclosed grand jury information to IRS agents for use in civil cases, illegally failed to disclose IRS personnel on the required disclosure notices, illegally used the grand jury to obtain evidence for use in later civil litigation, illegally disclosed the targets of the grand jury to embarrass and hinder the ongoing operation of the targets' business during the grand jury investigation, illegally imposed secrecy obligations on grand jury witnesses, illegally used pocket immunity to gather grand jury evidence, and illegally made witnesses assert their privilege against self-incrimination before the grand jury.

(2) Respondent's use of grand jury information in preparing petitioners' statutory notices of deficiency was illegal

---

[46]See notes 42 and 43 *supra.*

[47]At the hearing and in their briefs petitioners argue only the applicability of collateral estoppel. Therefore, we assume they have abandoned the remaining grounds raised.

and unconstitutional conduct, which shifts the burden of going forward with untainted evidence to respondent.

(3) Respondent's civil use of grand jury information or materials and other illegal activity in the grand jury is unlawful and unconstitutional conduct which requires the Court to suppress all grand jury information, materials, or leads respondent has received and to exclude from evidence all leads derived therefrom.

Respondent, on the other hand, opposes petitioners' arguments in maintaining:

(1) That he is not estopped from denying that he improperly received and used matters occurring before the grand jury in violation of law.

(2) That, other than information contained in the indictment returned against Kilpatrick, et al., respondent did not receive or use matters occurring before the grand jury in the preparation of the notices of deficiency issued to petitioners.

(3) Use of the information contained in the indictment in the preparation of the deficiency notices involved herein was proper and reasonable.

(4) In these circumstances, the remedies sought by petitioners, i.e., suppression of evidence and shifting the burden of going forward with the evidence to respondent, are not available to petitioners.

The "General Rule of Secrecy" explicitly set forth in rule 6(e) provides that certain persons, including an attorney for the Government and persons to whom disclosure is made under paragraph (3)(A)(ii), "shall not disclose matters occurring before the grand jury, except as otherwise provided for in these rules."[48]

In *United States v. John Doe, Inc. I*, 481 U.S. __ (1987), we receive this clear instruction—"it seems plain to us that rule 6(e) prohibits those with information about the workings of the grand jury from revealing such information to

---

[48]For the convenience of the reader, we again here recite the relevant provisions of rule 6(e)(3) concerning exceptions—

(A) Disclosure otherwise prohibited by this rule of matters occurring before the grand jury, other than its deliberations and the vote of any grand juror, may be made to—

(i) an attorney for the government for use in the performance of such attorney's duty; and
(ii) such government personnel * * * as are deemed necessary by an attorney for the government to assist an attorney for the government in the performance of such attorney's duty to enforce federal criminal law.

other persons who are not authorized to have access to it under the Rule." The purpose of the rule is to protect the secrecy of grand jury proceedings. The rule was not intended to cloak individuals under investigation in a protective mantle of concealment. *United States v. (Under Seal)*, 783 F.2d 450, 451 (4th Cir. 1986), cert. denied sub nom. *Raven's Hollow, Ltd. v. United States*, 481 U.S. ___ (1987). It is intended to protect only against disclosures "of what is said or what takes place in the grand jury room." *United States v. Interstate Dress Carriers, Inc.*, 280 F.2d 52, 54 (2d Cir. 1960). Indeed, the rule is "designed to protect from disclosure only the essence of what takes place in the grand jury room, in order to preserve the freedom and integrity of the deliberative process." *In Re Grand Jury Investigation*, 630 F.2d 996, 1000 (3d Cir. 1980), cert. denied sub nom. *Rittenhouse Consulting Enterprises, Ltd. v. New Jersey State Comm. of Investigation*, 449 U.S. 1081 (1981).[49] However, rule 6(e) does not shield for all time revelation of information that was previously presented to a grand jury. Accordingly, in *United States ex rel. Woodard v. Tynan*, 757 F.2d 1085, 1087-1088 (10th Cir. 1985), it is said—

Thus, when testimony or data is sought for its own sake—for its intrinsic value in the furtherance of a lawful investigation—rather than to learn what took place before the grand jury, *it is not a valid defense to disclosure that the same information was revealed to a grand jury or that the same documents had been, or were presently being, examined by a grand jury.*[50] [Emphasis added.]

With the above background and based on the record now before us, we think it essential to first address two additional matters over which counsel for the parties are deeply divided. The first concerns respondent's obtention and use of the indictment filed in the District Court on September 30, 1982, for civil audit purposes, that is, his reception and use as a basis for the notices of deficiency

---

[49]See *Hajecate v. Commissioner*, 90 T.C. 280, 285 (1988). *Hajecate* is factually distinguishable from the cases at bar and it involves a rule 6(e) order.

[50]See also *United States ex rel. Woodard v. Tynan*, 776 F.2d 250, 251 (10th Cir. 1985), where, following a rehearing en banc, the court said—"We therefore neither disavow nor affirm the prior panel opinion, 757 F.2d 1085, but choose to dispose of the case on the basis discussed herein;" *United States v. Interstate Dress Carriers, Inc.*, 280 F.2d 52, 54 (2d Cir. 1960).

which are before the Court.[51] The second relates to the meaning of the word "information" insofar as it impacts on these cases.

Respondent's position is that the filed indictment is a public record and that the procurement of a copy thereof and the use of the information contained therein in the formulation of the deficiency notices is reasonable and proper and *not* a violation of the secrecy provisions of rule 6(e). Petitioners, on the other hand, in opposing that position, would have us hold that the filed indictment is information which discloses matters occurring before the grand jury. In such posture, according to petitioners, its obtention and use by respondent, as a basis for the deficiency notices, is violative of the secrecy strictures of rule 6(e). We agree with respondent.

It is hornbook law that indictments cannot be considered as evidence. *United States v. Cox,* 536 F.2d 65, 72 (5th Cir. 1976). An indictment returned in open court, as here,[52] is a public record. *Central South Carolina Chapter, etc. v. Martin,* 431 F. Supp. 1182, 1190 (D.S.C. 1977), affd. 556 F.2d 706 (4th Cir. 1977), cert. denied 434 U.S. 1022 (1978). An indictment is only an accusation. It is the physical means by which a defendant is brought to trial, and its sole purpose is to identify the defendant's alleged offense. *United States v. Glaziou,* 402 F.2d 8, 15 (2d Cir. 1968), cert. denied 393 U.S. 1121 (1969).[53] The mandate of secrecy espoused in rule 6(e) clearly does not, nor could it be construed to apply to the collective findings in the form of an indictment by the grand jurors acting as a judicial body. *United States v. Ahmad,* 329 F. Supp. 292, 298 (M.D. Pa. 1971). In accord with the foregoing, we hold that the indictment filed in the District Court on September 30, 1982, is a public record and obtention of a copy thereof and use of the information contained therein by respondent did not, in any way, violate the secrecy provisions of rule 6(e).[54]

---

[51]Respondent concedes that the language used in these notices is based on that indictment. Our research has disclosed no reported case where respondent has used a filed indictment per se as a basis for his deficiency notice, and no such case has been presented to the Court by the parties.

[52]See p. 887 and note 23 *supra.*

[53]See also *United States v. Ciambrone,* 601 F.2d 616, 622 (2d Cir. 1979).

[54]Petitioners alternatively claim that an indictment is grand jury information. We reject this claim out of hand. While the indictment may be construed as a matter occurring before the

See and compare *Kirkland v. Commissioner*, T.C. Memo. 1986-492. In our view, no question of the disclosure of matters occurring before the grand jury is therefore involved, and rule 6(e) does not, nor could it, prohibit respondent's obtention and use of the publicly filed indictment. See and compare *United States v. Interstate Dress Carriers, Inc., supra* at 54.[55]

### Collateral Estoppel

It has long been established that the doctrine known as collateral estoppel precludes litigation of any issue of fact or law that is actually litigated and necessarily determined by a valid and final judgment. *Montana v. United States,* 440 U.S. 147, 153 (1979); see 1 Restatement, Judgments 2d, sec. 27 (1982).[56]

Petitioners argue that respondent is collaterally estopped from denying that his civil agents (revenue agents) had access to, and used for civil audit purposes, matters occurring before the grand jury without obtaining an order from the District Court pursuant to rule 6(e). Specifically, petitioners claim that the District Court in *United States v. Kilpatrick,* 594 F. Supp. 1324 (D. Colo. 1984) (hereinafter sometimes called *Kilpatrick II*), "found" that respondent illegally used the grand jury to obtain evidence for use in later civil litigation and that respondent illegally received and used grand jury information for use in civil cases in violation of rule 6(e).[57] We disagree.

---

grand jury, once it is filed in open court, it is a public record, and the secrecy provisions of rule 6(e) are not applicable to it.

[55]Petitioners' reliance on *United States v. Baggot,* 463 U.S. 476 (1983), and *United States v. Sells Engineering, Inc.,* 463 U.S. 418 (1983), both at the hearing and in their briefs, is wholly misguided. Both of those cases involved a rule 6(e) order. Neither case involved the use of an indictment filed in open court for civil audit purposes. *Baggot* addressed and answered the issue of whether a civil tax audit is "preliminary to or in connection with a judicial proceeding" within the meaning of rule 6(e)(3)(C)(i). *Sells Engineering, Inc.* addressed and answered the issue of under what conditions may civil attorneys for the Government obtain access to grand jury materials for the purpose of preparing for and pursuing a civil cause of action.

[56]We observe that the principal substantive issue raised by the petitions filed herein relates to respondent's disallowance of passthrough partnership losses claimed by the limited partners/petitioners.

[57]Petitioners also contend that other facts found in *Kilpatrick II* estop respondent from denying that respondent's grand jury investigation of Kilpatrick, et al., illegally included IRS agents as grand jury agents, illegally imposed secrecy obligations on grand jury witnesses, illegally used pocket immunity to gather grand jury evidence, and illegally made witnesses

The District Court, in *Kilpatrick II,* stated that "the evidence *suggests* that information was disclosed to other IRS agents for use in civil cases." (Emphasis added.) *United States v. Kilpatrick,* 594 F. Supp. at 1331. It further stated that there is "a serious *possibility* that the extraordinary powers of the grand jury were manipulated in order to obtain evidence useful in later civil litigation." (Emphasis supplied.) *United States v. Kilpatrick,* 594 F. Supp. at 1332. While the District Court did find as a fact that IRS agents manipulated the grand jury to obtain materials to be used for civil litigation (*United States v. Kilpatrick,* 594 F. Supp. at 1345), the Court of Appeals, as to this specific finding, countered—"We do not find support for [this finding]." *United States v. Kilpatrick,* 821 F.2d 1456, 1471 (10th Cir. 1987). Finally, after reviewing the voluminous record before it, we think it significant that the Court of Appeals concluded that—"the fact that the grand jury returned an extensive indictment is probative evidence that it was *not* abused to obtain evidence for civil purposes." (Emphasis supplied.) *United States v. Kilpatrick,* 821 F.2d at 1471. Similarly, we have found that no matters occurring before the grand jury were disclosed for civil audit purposes and that the notices of deficiency here were based purely on the indictment, which is a public record. Accordingly, we hold that the doctrine of collateral estoppel is not applicable to these proceedings and, in our sound discretion, we decline to apply it. See *Parklane Hosiery Co. v. Shore,* 439 U.S. 322, 331-332 (1979).[58]

### Shifting the Burden of Proceeding and Suppression of Evidence

The existence of a legal wrong (i.e., improper obtention and use of matters occurring before the grand jury, in

---

assert their privilege against self-incrimination before the grand jury. These findings do not involve rule 6(e) *disclosure* violations and are not relevant to these proceedings.

Petitioners also seek to estop respondent from denying that he illegally failed to disclose IRS personnel on the required disclosure notices and illegally disclosed the targets of the grand jury to embarrass and hinder the ongoing operation of the targets' business during the grand jury investigation. While the District Court and the Court of Appeals found these to be rule 6(e) violations, there is absolutely no evidence in this record showing that these violations resulted in the disclosure of matters occurring before the grand jury for civil audit purposes.

[58]Petitioners' place heavy emphasis on *Kluger v. Commissioner,* 83 T.C. 309 (1984), in their other arguments. Suffice it to say, that case, which involved a rule 6(e) order, is also factually distinguishable from the matters we herein consider.

violation of rule 6(e)) is a completely separate question from the remedy to be afforded upon proof of that legal wrong. See *Graham v. Commissioner,* 82 T.C. 299, 310 (1984), affd. 770 F.2d 381 (3d Cir. 1985).[59]

The crux of petitioners' position, insofar as these proceedings are concerned, is that "matters occurring before the grand jury," in violation of rule 6(e), were received and used by respondent for civil audit purposes. Our holding herein is to the contrary. Therefore, since no wrong has been proved, the remedies petitioners seek are not now available to them.[60]

### Other Matters

We think it necessary to conclude this opinion with a few observations. In their brief and reply brief, petitioners make a number of misleading statements and misrepresentations. Some of them are:

(1) At page 63 of their brief, petitioners' state—

Revenue agent Gullion knew that he wasn't supposed to use grand jury information, and he was aware of both *Sells Engineering, Inc.* and *Baggot* before he prepared the partnership RAR's [Revenue Agent's Reports] and before he prepared the statutory notice language. Additionally, Denver District Counsel approved the use of grand jury information for the statutory notices after *Sells Engineering, Inc.* and *Baggot* had been issued.

The record shows without equivocation that Gullion received a copy of the indictment in *October 1982* (Stip. par. 26); that the Revenue Agent's reports are dated *January 31, 1983* (Stip. par. 29 and Exhibits 17-Q through 20-T); and that the memorandum from District Counsel, approving the statutory language, is dated *February 14, 1983* (Stip. par. 38 and Exhibit 34-AH). *United States v. Baggot,* 463 U.S. 476 (1983), and *United States v. Sells Engineering, Inc.,* 463 U.S. 418 (1983), were issued by the Supreme Court on *June 30, 1983.*

(2) At page 61 of their brief, petitioners' assert—

---

[59]Petitioners' undue reliance on *Graham v. Commissioner,* 82 T.C. 299 (1984), affd. 770 F.2d 381 (3d Cir. 1985), is unwarranted. Suffice it to say, that case, which involved rule 6(e) orders, is factually distinguishable from the cases at bar.

[60]Petitioners also place undue emphasis upon *Cohen v. Commissioner,* a Memorandum Sur Order of this Court (which carries no precedential value) unofficially reported at 42 T.C.M. 312 (1981). Moreover, the facts in *Cohen* bear no semblance to those herein under consideration.

In this case, the limited partners, the petitioners herein, are trapped in the middle of the government's unconstitutional misconduct. The IRS and the Department of Justice have all the partnerships' *books and records* in the sealed grand jury files. \* \* \* [T]he government made sure that all the *books and records* are out of the petitioners' reach \* \* \* [Emphasis supplied.]

Petitioners could have sought access to these books and records for their own intrinsic value. *United States v. Interstate Dress Carriers, Inc.,* 280 F.2d at 54. See also *Anaya v. United States,* 815 F.2d 1373, 1378-1379 (10th Cir. 1987). For reasons known only to them, petitioners have failed to seek access to these books and records.

(3) At page 13 of their reply brief, petitioners' state— "Judge Kane concluded that Agent Gullion's use of the indictment was a disclosure of grand jury information." An exhaustive consideration of Judge Kane's opinion reveals no such conclusion.[61]

*An appropriate order will be issued.*

---

[61]In view of our disposition of petitioners' motion we need not and do not address other arguments raised by petitioners.

